UNITED STATES of America, Appellee,

v.

David G. RACE, Thomas A. Blocker, Michael G. Leatherwood, Appellants.

No. 78–5140.

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1980.

Decided Sept. 25, 1980.

Peter R. Kolker, Washington, D. C. (Zuckerman, Spaeder & Taylor, Washington, D. C., on brief), for appellants.

J. Clifford Ryan, Asst. U. S. Atty., Charleston, S. C., Mark N. Stempler, Trial Atty., U. S. Navy, Washington, D. C. (Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., Carolyn J. Adams, Third Year Law Student, on brief), for appellee.

Before RUSSELL, WIDENER and PHILLIPS, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

The defendants Race, Blocker, and Leatherwood appeal their conviction under an indictment charging the submission by the defendants of false and fraudulent invoices for payment of services and materials rendered a division of the Department of Navy in violation of §§ 2, 371, and 1001, 18 U.S.C. We reverse.

The prosecution arose out of the performance by Consolidated Services, Inc. (hereafter CSI), an engineering firm wholly owned and operated by the defendants, under a contract with the Naval Supply Center at Charleston, South Carolina, as the procurement arm of the Department of Navy in the Southeastern Region, for the delivery of labor and services as ordered by the Naval Electronics Engineering Center (hereafter NAVELEX), a Naval operational unit. CSI had been engaged in work—presumably similar to that with which the challenged contract was concerned—for the Navy for several years prior to the execution of this contract. Until 1975 this work had been performed under fixed price contracts. In February of that year, however, the Naval Supply Center began to use in its contracts with CSI, a unique type of contract described as one indefinite in quantity, time and materials but subject to an overall dollar limit. This form of contract, it was explained, was used when it was not possible at the time of the contract award to estimate the extent and duration of the work or to anticipate costs. Such contract would set forth the hourly rate chargeable to the Navy for the workers and the materials required for any work and certain other charges allowable under the contract. All work under the contract was to be made only pursuant to delivery orders. All these delivery orders repeated the general provisions of the contract and in particular the agreed payment rate for the services or materials requested. Thus if the work involved the use of a plumber the wage rate to be paid for such plumber would be stated in the delivery order as prescribed in the contract by the authorized employee of NAVELEX and, similarly, if the work was to be performed at a point away from Charles-

ton for which a per diem was allowable, that, along with the rate to be paid as per diem would be set forth in the delivery order. Payment by the Navy under the contract was made in accordance with billings covering these delivery orders.

The first of such indefinite contracts between CSI and the Naval Supply Center was executed in February, 1975. That contract, referred to in the record as 113, has been fully performed and audited. The Navy apparently has made no claim of improper charges or fraud in connection with that contract but the contract is relevant, because of its similarity to the contract which provides the basis for the prosecution and because of the construction given by the Navy and the defendants to the provisions in that contract which are similar to those in the challenged contract. The contract, which is the centerpiece of this prosecution and is referred to as 061, was executed later. It, too, was indefinite in quantity, time, and materials and had an approximate limit of a million dollars. It was in connection with this second contract that CSI, under the alleged direction of the defendants, made the billings, which form the basis for the charges in the indictment under § 1001.

█ The elements of an offense under § 1001 are the making (a) "in any matter within the jurisdiction of any department or agency of the United States," of (b) a false statement of (c) material fact with (d) fraudulent intent. *United States v. Weatherspoon,* (7th Cir. 1978) 581 F.2d 595, 601; *United States v. Glazer,* (2nd Cir.) 532 F.2d

224, 228, *cert. denied,* 429 U.S. 844, 97 S.Ct. 123, 50 L.Ed.2d 115 (1976); *United States v. McCue,* (2nd Cir.) 301 F.2d 452, 454, *cert. denied,* 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962). These elements are sequential. Thus, the two threshold issues that must first be answered in every case under § 1001 are the involvement of an agency of the United States and the falsity of the statement. Unless those two facts are established there is no need to consider either the materiality of the statement or whether it was made *knowing* it was false or, as some cases put it, with fraudulent intent, and the prosecution must fail. The controverted billings (except for the three small items) [1] fall into two broad groups, both of which the Government contends were false, material and fraudulent and thus within the statute: (1) billings in amounts in excess of the amounts allowable under the contract; [2] and (2) billings for work and/or materials which, though performed and furnished, were not properly authorized in advance. The Government contends that the billings in the first group which were in excess of the amounts authorized under the contract consisted of (1) invoices for per diem for work done more than fifty miles from Charleston, (2) invoices covering a charge for handling materials, and (3) invoices for mileage allowances. The other group of billings in controversy (save for two or three minor items), represented claims for which the Government claimed there was no validly authorized delivery order. This group consisted of (1) cross–billing,[3] (2) overtime billing,[4] (3) sub-

---

1. There were three items which seem to have been the only items in the controversy not within the work contracted for by the Navy and for which payment or credit was not authorized. One was the purchase of a police scanner which had no relation to the contract. The cost was in the range of $100. The Navy was charged, also, under the contract for some work done on a private boat owned by one of the defendants. The final item concerned some materials left over after completion, which it is alleged, the defendants did not turn over to the Navy.

2. There is no contention that the services were not rendered or the materials furnished which were covered by the billings, only that the billings were beyond the sums allowable under the contract for services rendered or materials furnished.

3. This practice of cross billing occurs when charges are shifted among several delivery orders under the contract. This is contrary to the terms of the contract. The defendants, however, contended that such transfers or shifts were approved both in practice and orally by NAVELEX and contributed to the efficient performance of the contract. It is said that no loss to the Government resulted from this practice, thus negativing any fraudulent intent on their part in the use of the practice.

4. See note 4 on page 1117.

contracting,[5] and (4) partial billing.[6]

The charge involving the first group of billings (*i. e.*, those claimed to be stated in amounts greater than authorized in the contract) was defended by the defendants primarily on the ground that the Government had not met the threshold requirement of proof that the billings were false or inaccurate. In effect, the defendants defended as to these items by asserting the billings were in accordance with the terms of the contract itself and were not false. This presented basically a question of the construction of the pertinent terms of the contract. Save in the exceptional cases, such a question presents an issue to be resolved solely by the court. The billings in the second group, on the other hand, depend for their validity upon the existence of departures from the language of the contract either authorized by valid oral changes or supported by such evidence of acquiescence or ratification as to amount to a valid change in the contract. Those issues represent primarily questions of fact to be resolved by the jury in the event of dispute. In this case there is a dispute whether these contract changes were in fact validly authorized and whether the billings were issued with fraudulent intent. The District Court properly, therefore, submitted those issues to the jury on the basis of the record then before it. We are, however, of the opinion that the District Court erred in concluding that the billings in the first group, covering what was alleged to be excess billings, were false and fraudulent and in failing to dismiss as a matter of law the charges based on billings for per diem and material han-

dling. Since these billings were an integral part of all the charges against the defendants, the failure of the District Court to eliminate these billings from the consideration of the jury requires the reversal of the convictions. Our reasons for this conclusion will require a separate discussion of the three types of billings involved in this first group. We begin with the per diem billings for work done more than fifty miles from Charleston.

The written contract itself was quite specific on what per diem payments CSI was entitled to under the contract. It began by declaring unequivocally that "Per Diem shall not be paid for services performed at Contractors' Charleston area facility or at any location within a fifty (50) mile radius of NAVELEXSYSENGCEN." It was equally emphatic, as set forth in the next succeeding sentence, that "Per Diem *will be paid* in accordance with the provisions of the Military Joint Travel Regulation for civilians in amounts as shown both in CONUS and Overseas. Per Diem rates will be indicated in each Delivery Order." (Italics added) The testimony was that, in connection with performance under the contract, the issuing officer in NAVELEX would secure from Mrs. Walsh, designated in the contract as "the representative of the Contracting Officer [to] be contacted for contract administration purposes," the appropriate per diem rate, as stated in the "Military Joint Travel Regulation," to be used in each delivery order for per diem, and he would insert this rate in each delivery order issued to CSI covering per diem.[7] Generally this rate was $33.

4. In a number of delivery orders, no overtime was authorized. However, completion of the work authorized was accomplished by incurring overtime expense. CSI collected for overtime by converting overtime into straight time on the ratio of one–and–a–half hours of straight time for each hour of overtime and billed for this increased amount of straight time. This arrangement the defendants claimed was approved by NAVELEX.

5. The defendants subcontracted on two occasions work authorized under the contract. Prior written approval of such subcontracts was not obtained. The Government contended that,

under the contract, such prior written approval was required. The defendants claimed, on the other hand, that the subcontracts were known and approved by NAVELEX.

6. This item, as its title suggests, refers to a practice of partial billing under a delivery order. The Government said such practice was not authorized under the contract; the defendants contended the practice was a common one in the construction industry.

7. Under the first indefinite contract, the delivery orders were issued through the Contracting Office itself. However, the procedure was dif-

In its billing CSI used always precisely the same figure for its billing charges as was set forth by the issuing officer of NAVELEX in the delivery order. This method of billing for per diem followed the procedure followed by CSI when it had billed for per diem under its earlier indefinite contract, in which the contractual provision for payment of per diem was the same as in the contract in question. In May, 1975 the earlier contract had been audited before performance commenced under the contract in question. The auditor was advised at that time that CSI was interpreting the contract provision as entitling it to payment of per diem in accordance with Military Joint Travel Regulation, irrespective of what CSI might pay its employees for per diem. CSI made this very plain to the auditor, who noted the point in her report for the attention of the Contracting Officer. CSI was not later advised by either the Contracting Officer, who received a copy of the report, or the Defense Contract Audit Agency, under which the auditor worked, that its interpretation of the manner in which per diem was to be billed was inaccurate.

Under these facts, it is the position of the defendants that the literal language of the contract with reference to per diem charges, as well as their interpretation of the contract, as adopted independently by the ordering officer of NAVELEX after referring the matter to the official in the Contracting Office designated in the contract for advice on its administration and not rejected either by the Contracting Officer or by the Defense Contract Audit Agency after both were advised of CSI's construction and application of the pertinent contractual provision, clearly established that CSI's billings for per diem were in strict compliance with the plain language of the contract and the pertinent delivery orders and the District Court should have so ruled, granting the defendants' motion for judgment of acquittal on such billings.

The Government, however, disputes that the contract provides specifically that CSI was to be "paid" per diem under the Military Joint Travel Regulation (hereafter MJTR) for workers engaged on the contract more than fifty miles from Charleston. It states in its brief that any such construction of the language of the contract "is ludicrous and strains the words of the clause beyond their limit." Under its construction of the contractual language, CSI was only to be "reimbursed" for its actual per diem expenditure, subject to a maximum limitation as fixed by the rate to be paid under the MJTR.

We are unable to follow the Government's complicated adaptation of the per diem clause in the contract. Its construction of the clause is far more than a "strained" interpretation of the clause; it is a complete rewriting of the contractual clause in order to express what the Navy may have meant to say (though we doubt this) and not what it said. The exact language of the clause is as clear–cut and precise as a careful drafter could make it. It does not state that CSI will be merely "reimbursed" for its actual per diem expense incurred. It declares that *Per Diem will be paid* in accordance with the provisions of the Military Joint Travel Regulation" for any per diem incurred more than fifty miles from Charleston. (Italics added) To apply the clause as thus written cannot be dismissed as "ludicrous" or "strained." Even the Government's expert witness on contract interpretation conceded that taken "literally" as written, the clause authorized payment of per diem in accordance with the schedule set forth in the MJTR. But what the Government really is contending is that, while under the "literal" language of the contract the contractor was entitled to payment as fixed under the MJTR, it would be unfair to permit such payments if the con-

ferent in the performance under the second contract, which is the contract directly involved in the prosecution. In this later contract, either by acquiescence or by direct delegation, the delivery orders were issued by the issuing officer of NAVELEX, who generally was Bowers. Whenever any question arose about a proposed delivery order, Bowers would request instruction from Mrs. Walsh in the Contracting Officer's office and he would follow such instructions.

tractor itself did not pay that same per diem to its employees,[8] and, therefore, the court should hold that the contractor could be paid, not what was provided in the MJTR, which was what the contract said, but what it had actually reimbursed its employees by way of per diem. To do that would require a complete rewriting of the contract. But courts do not write the contracts of parties retroactively, but merely construe the terms of the contract the parties have previously signed.

Actually we are not convinced that the contract clause fails to express just what the Navy intended to say. The per diem fixed in the MJTR is, in the opinion of the Department, a fair and reasonable allowance, but in many instances it will be less than what a person entitled to per diem may incur. It is reasonable to assume that the Government chose to *pay* what it had found to be a fair allowance rather than to undertake to *reimburse* what the employee or his employer actually paid in per diem, which might in many cases be considerably in excess of the Government's allowance. That this is not a fanciful scenario is evident from the claims of several employees of CSI that they had had to pay $39 per day just for their room when detailed to work more than fifty miles from Charleston on per diem. The possibility of incurring such expensive per diem was likely what the Contracting Office was, by its language, seeking to avoid. If this was the intention, it was a perfectly reasonable thing for the Navy to have phrased the contract as it did; there is nothing "ludicrous" about it. It thus was of no moment that CSI itself had a rule under which, wherever the employee was sent, his per diem was $25 per day, a rule that the record shows sometimes worked to the employee's advantage and sometimes to the employee's disadvantage. That was a matter the contract left to the

contract between CSI and its employees, and the Government was not to concern itself with whether the actual payment made by CSI to its employees was more or less than that fixed in the MJTR. If the Navy had wanted to contract differently and to restrict its per diem payment to what the employer itself allowed by way of per diem to its employees, it, with its staff of trained expert contract draftsmen, could easily have so provided,[9] and we will not presume in this case that its experts "nodded," but we shall assume that these drafters wrote precisely what was intended.

Since we are convinced that the contract very clearly authorized CSI to bill the Navy for per diem incurred more than fifty miles from Charleston, pursuant to the figures set forth in MJTR, there was nothing inaccurate, false, or fraudulent in CSI's billing the Navy in accordance with that contract language and no basis for a prosecution on that account under § 1001, in which the cornerstone of the stated offense is always the falsity of the statement. *United States v. Weatherspoon*, 581 F.2d at 601 (". . . the Government was required under 18 U.S.C. § 1001 to establish not only that the certification was false, but also that Weatherspoon had made the certification *knowing* it to be false." (Emphasis in opinion)); *United States v. Adler*, (2nd Cir.) 380 F.2d 917, 920, *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. Diogo*, (2nd Cir. 1963) 320 F.2d 898, 902–03; *Stevens v. United States*, (6th Cir. 1953) 206 F.2d 64, 66; *United States v. Clifford*, (E.D.N.Y.1976) 426 F.Supp. 696, 705. We attach no weight to Commander Dolina's expert testimony on the interpretation of this clause. The clause includes no words of art, but only words of common understanding and use, requiring no special expertise for their in-

8. For another case where the Government, in a cost-plus contract, obligated itself to pay a contractor wages which the contractor was neither obligated to pay nor did pay to its employees, see *H & M Moving, Inc. v. United States*, (1974) 204 Ct.Cl. 696, 499 F.2d 660.

9. That this is so is evident in the phraseology employed by the Navy's drafters in stating the obligation of CSI to pay for travel. That clause was stated precisely in the way the Navy would like to read the per diem clause, *i. e.*, reimbursement of actual payment to the employee, subject to a maximum of 15 cents per mile. *See* discussion of travel allowances *infra*.

terpretation. Expert testimony on the meaning of such language is both superfluous and improper. *Marx & Co., Inc. v. Diners' Club, Inc.*, (2nd Cir.) 550 F.2d 505, 510, *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). The meaning of a clause, couched as this one was in language of common use and understanding, was purely a matter of law for the court, which should have granted the defendants' motion to dismiss any charge based on the defendants' billing for per diem under the contract.

■ Even if we were to accept the Government's argument that the per diem clause is ambiguous, which would be the best that could be said for the Government's argument, the result would not be different. To be ambiguous a contract must be susceptible of at least two reasonable constructions. When the Government concedes that the clause is ambiguous, it necessarily concedes that the defendants' construction of the per diem clause, which is one of the constructions, is reasonable. Such a conclusion requires a ruling that the defendants cannot be convicted under § 1001 for a statement or billing which may be said to be accurate within a reasonable construction of the contract. This is so because one cannot be found guilty of a false statement under a contract beyond a reasonable doubt when his statement is within a reasonable construction of the contract. This was clearly stated in the recent case of *United States v. Anderson*, (8th Cir.) 579 F.2d 455, 460, *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). There the court said:

> "In light of these ambiguities, under Counts II–V of the indictment, it was incumbent upon the government to introduce proof sufficient to establish the falsity of the statements as well as the defendant's knowing and willful submission of the statements. In carrying out that burden the government must negative any reasonable interpretation that would make the defendant's statement factually correct. *See United States v. Steinhilber*, 484 F.2d 386, 389–90 (8th Cir.

1973); *United States v. Diogo*, 320 F.2d 898, 907 (2d Cir. 1963). Our review of the record compels us to find that the government failed to clarify the facial ambiguities in the certification clause, and therefore failed to establish that Leslie Anderson willfully submitted the reimbursement invoices knowing the certifications to be false. We thus reverse Judge Anderson's conviction on Counts II–V."

It follows from this statement that whenever a defendant's statement or action under a contract accords with a reasonable construction of the enabling language of the contract, the Government will not have carried its burden of "negativ[ing] any reasonable interpretation that would make the defendant's statement factually correct" and thus a conviction under § 1001 cannot stand under those circumstances.

The Government seems to assume that the question of the defendants' guilt in connection with these billings does not turn, however, on whether the action of the defendants was within the reasonable construction of the contract (*i. e.*, whether the billings were false or inaccurate), but on whether the defendants acted in good faith (*i. e.*, knew its billings violated the terms of the contract). We are somewhat uncertain whether the Government, by this contention, is arguing that lack of good faith makes irrelevant the question whether the action of the defendants was proper and within the reasonable interpretation of the contract. If so, it overlooks the fact that, in order to make out an offense under § 1001, the Government must prove both the falsity of the statement and, in addition, that the utterer knew the statement was false. *See United States v. Weatherspoon*, 581 F.2d at 601. It thus makes no difference what the defendants thought if CSI's billings were authorized under a reasonable interpretation of the contract; their thought in that regard becomes important if, but only if, the billing was false, that is, was not within the reasonable construction of the contract.

Actually, though, if it be assumed that the defendants' good faith in their construc-

tion of the contract is important, there is no evidence in the record to support a finding by the jury that the defendants did not believe in good faith that CSI was entitled under the contract to payments for per diem as billed. If all CSI was doing was billing for what it construed the contract entitled it to for per diem, there could be no basis for a finding of fraudulent intent. The only theory on which the Government relies for its claim of bad faith in billings by CSI is its contention that CSI, when it paid its employees for per diem under its own standardized rate for per diem, did not put on the receipt the employee was asked to sign, the amount which it had been paid for that per diem by the Navy. This omission, however, had nothing to do with what the Navy, by its contract, had agreed to pay CSI.

■ Finally, the Government would fault CSI (and the defendants) because it failed "to exercise due diligence to discover and bring to the attention of the Contracting Officer at the earliest possible time any ambiguities," in relation to the per diem payments. This, it said, was a requirement of the contract. The obvious answer to this is that CSI never assumed that the per diem clause in the contract was "ambiguous," nor, for that matter have we found it ambiguous. Moreover, any obligation to inquire of the Government about the meaning of ambiguous language in a contract is a requirement that *only arises* when the *ambiguity* is *latently* ambiguous, rather than patently ambiguous. *H & M Moving, Inc. v. United States*, 499 F.2d at 671. If there was *any* ambiguity, latent or patent, in this claim (which we do not find), it was a latent ambiguity, and thus there was no obligation on the part of CSI to inquire about the construction of the per diem clause in the contract. But, even if there was such an obligation, the Navy was on notice, even before work under the contract began, and continuously during performance, exactly how CSI interpreted the pertinent clause as well as evidence how the issuing officer of NAVELEX, acting under the advice of a representative of the Contracting Officer (Mrs. Walsh) interpreted it. This put the

Navy as much on notice as if CSI had actually brought the matter up with the Navy. If that construction were wrong, the Navy should have so advised CSI. Not having done so, it has no right to complain of any failure of CSI to bring to its (the Navy's) attention the construction adopted by it (CSI). All of this, however, is irrelevant to this phase of the case, since, as we have already found, the per diem clause is not ambiguous, and there was no need for CSI to have sought from the Navy clarification of a clause as clearly expressed as was the per diem clause.

■ The second item in this group relates to a flat charge of 20 percent as a materials handling charge. The contract, in fixing payment for "the actual cost of material items," incorporated by reference § 7–901.-6(b)(1), 32 C.F.R., a part of the Armed Services Procurement Regulation. Such Regulation provided:

"Reasonable and allocable material handling costs may be included in the charge for material to the extent they are clearly excluded from the hourly rate. Material handling costs are comprised of indirect costs, including when appropriate, General and Administrative expense, allocated to direct materials in accordance with the Contractor's usual accounting practices consistent with Part 2, Section XV of the Armed Services Procurement Regulation."

Under its earlier indefinite contract, with like provisions to those of the contract involved in this prosecution, CSI had added a charge of 15 percent as a handling charge under this Regulation. When that contract was audited in May 1975, the auditor made an independent determination of what was a proper handling charge under this Regulation. She arrived at approximately 19.5 percent as proper. She did take exception to keeping "material handling expense in the same overhead account with other overhead costs" and to the failure to "separately identify material handling on a separate cost account or separate pool" as an accounting practice. Under the subsequent

contract, CSI sought to comply with what it understood to be the findings of the auditor, which apparently were confirmed on review by both the Defense Contract Audit Agency and the Contracting Officer. CSI did take a round figure of 20 percent, rather than the 19.5 percent figure developed by the auditor. But it is not suggested that this slight variance is important. This conduct of CSI was manifestly reasonable both under the language of the contract and the dealings of the parties. So plain was all this that the District Judge, in ruling on a motion for acquittal, said with reference to this claim of overbilling (as well as the other claim of overbilling):

> "[I]f this were a civil case and we were trying a case where the government was making a claim against contractors for a refund of X dollars and I didn't have any more evidence than I had here about the overcharge, I would eliminate it from the case."

We agree that the billings were shown to be authorized and substantially accurate under the contract and would not support a recovery in a civil action. Even more certain is the fact that in a criminal case, where the threshold issue is the inaccuracy and falsity of the billing to be proved beyond a reasonable doubt as distinguished from a mere preponderance of the evidence as in a civil suit, the defendants are entitled to a judgment of acquittal on this item.

■ The final item in this group concerns billings for transportation. The pertinent contract clause is:

> "(e) *Transportation* –The Contractor will be reimbursed for necessary expenses on the basis of actual cost as determined and approved in advance by the Contracting Officer for both material, equipment and personnel.
>
> "(1) *Personnel* –The Contractor shall be reimbursed for the reasonable actual cost of transportation not to exceed the cost of first class rail or plane fare (on a no–delay basis) and on a mileage allowance not to exceed fifteen cents ($.15) per mile when private automobile is used to the extent such transportation is necessary for the performance of services under this contract."

Under this clause CSI made a practice of seeking reimbursement at the highest allowable rate for private automobile transportation (*i. e.*, 15 cents per mile), though it actually paid the employee 10 cents to 12 cents per mile. It will be noted that, unlike the language of the per diem clause, discussed *supra*, which authorized *payment* absolutely of $33 per day, this clause only authorizes *reimbursement* of reasonable actual cost. It was necessary, therefore, for CSI to establish that the reasonable actual cost for motor transportation had been 15 cents per mile before it could bill the Navy at that rate. To do this it would appear that CSI took the position that the same principle which allowed an addition to material costs applied likewise to transportation costs. The District Court apparently left this issue to the jury, though this is not entirely clear. Since the case must be remanded for a new trial, the trial court should, on remand, construe the contract and determine whether it finds the billing permissible under a reasonable interpretation of the contract. If it is, and if the charge of 15 cents per mile were justified under the contract thus interpreted, this item should be dismissed from the case.

■ There are a number of other issues raised by the appeal. Since the case must be remanded for a new trial, and it is unlikely some of these issues will arise on retrial, we find it unnecessary to consider them. There is one question, however, which should be noted and resolved in order to aid the court on retrial. This question relates to the testimony of Miss McMahon about a discussion between the NAVELEX officers in charge of performance by CSI under the contract, and certain of the defendants, which the defendants contend supported their contention of oral modification of the contract and of estoppel to deny modification. The District Court found the evidence admissible if testified to by the defendant involved in the conversation, but inadmissible if testified to by Miss McMahon. We think this error so far as it found Miss McMahon's testimony inadmissible.

The case is remanded to the District Court with directions to dismiss those items

found not to support a finding of guilt, as identified herein, and for retrial of the other matters included in the substantive counts free from any possible prejudice inherent in including the matters found by us not to constitute offenses under the statutes relied upon.

*REVERSED AND REMANDED WITH DIRECTIONS.*