UNITED STATES of America, Appellee,

v.

Herbert G. BLECKER, Appellant.

UNITED STATES of America, Appellee,

v.

ICARUS CORPORATION, Appellant.

Nos. 80–5014, 80–5015.

United States Court of Appeals,
Fourth Circuit.

Argued April 10, 1981.

Decided Aug. 27, 1981.

Rehearing and Rehearing En Banc
Denied Oct. 20, 1981.

Jacob A. Stein, Washington, D. C., Plato Cacheris, Alexandria, Va. (Robert F. Muse, Washington, D. C., on brief), for appellants.

Frank J. Marine, Dept. of Justice, Washington, D. C. (Justin W. Williams, U. S. Atty., Alexandria, Va., William S. Lynch, Dept. of Justice, Washington, D. C., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and G. Ross ANDERSON, Jr., United States District Judge, sitting by designation.

JAMES DICKSON PHILLIPS, Circuit Judge:

Icarus Corporation (Icarus) and its president, Herbert Blecker, challenge the convictions of each on six counts of presenting false claims to an agency of the United States in violation of 18 U.S.C. § 287 and Icarus' conviction on two counts of mail fraud in violation of 18 U.S.C. § 1341. Icarus and Blecker contend that venue was improper in the United States District Court for the Eastern District of Virginia. They further argue that there was insufficient evidence to support the convictions for either submitting false claims or mail fraud and that remarks made by the prosecutor in his summation to the jury effectively deprived them of a fair trial. We find all the contentions of the defendants to be without merit and accordingly affirm their convictions.

I

Briefly stated, the government alleged in its indictment of Icarus and Blecker that the defendants submitted invoices for fees based on false resumes to the Computer Sciences Corporation (CSC) knowing that CSC, in turn, would present the claims to the General Services Administration (GSA) for payment. Icarus was also charged with mail fraud in causing these invoices to be mailed to a CSC office in California.

The evidence presented at trial tended to show that, in March 1972, CSC was awarded a multimillion dollar contract by the GSA to provide federal agencies with computer and data processing services. Under the terms of this National Teleprocessing System (NTS) contract, CSC provided all the normal supply requirements for computer services for most of the federal government. CSC was authorized to subcontract for consulting services that, under Schedule J of the NTS contract, were to be paid for at rates based upon the consultants' education and experience.

In 1973, CSC subcontracted for consulting services from Icarus. At this time Blecker was told by a CSC official that rates were set according to very specific requirements for education and experience and was given a copy of the NTS contract. Blecker then instructed a number of his employees to embellish their resumes with additional schooling and experience and had the resumes of other employees enhanced without their knowledge. These false resumes were then taken from Icarus' office in Maryland to an official at CSC's Rosslyn, Virginia office for use in computing consultant fees.

In order to receive compensation for services performed under the NTS contract, Icarus was required to prepare and submit invoices to CSC on a monthly basis. At its Rosslyn office, CSC employees checked the rates billed on the Icarus invoices with the resumes of Icarus employees to determine whether Icarus had billed the approved rate for those employees. CSC employees then made the necessary computations and prepared a billing sheet. Information from the billing sheet was transmitted via computer from the CSC office in Rosslyn to the CSC accounting office in El Segundo, California. There, CSC employees prepared a bill for the GSA from the information contained in the Icarus invoices and billing sheets. The bills were then mailed back to the CSC offices in Rosslyn, from which they were hand delivered to the GSA office in Washington, D.C. CSC employees also mailed the Icarus invoices from its Rosslyn office to its California office, where CSC employees used the invoices to prepare a check payable to the order of Icarus. These mailings were the subject of the mail fraud charges.

Throughout the presentation of their defense to the false claims charges, Icarus and Blecker attempted to introduce evidence that the Government got its money's worth

from the services billed by Icarus. The court, however, excluded as irrelevant any testimony about the value of the services performed by Icarus, and it instructed the jury to this effect. The court also refused to give an instruction that the jury should consider whether the "puffing" of resumes engaged in by Icarus was a common business practice for which it should not be held criminally liable.

During the course of his closing argument, the prosecutor urged the jury not to allow the defendants to cheat, lie, scheme and defraud and to show the defendants "that crime does not pay." He also remarked at one point that, while Icarus paid its employees at one rate, "[w]e had to pay more." When the defendants objected to this statement, the court took the precaution of instructing the jurors that they were not to feel they had a personal stake in the outcome of the case. The case was subsequently submitted to the jury, and it returned verdicts of guilty against Icarus and Blecker on the false claims counts and against Icarus on the mail fraud counts.

## II

■■■ The defendants contend at the outset that their conviction on the false claims counts in the Eastern District of Virginia was unlawful because that court lacked venue to try those charges. The sixth amendment unequivocally mandates trial in the "State and district wherein the crime shall have been committed," and proof of venue is therefore an essential part of the government's case without which there can be no conviction, *United States v. Jones*, 174 F.2d 746, 748 (7th Cir. 1949). When, as in the present case, however, the statute defining the substantive offense "does not indicate where Congress considered the place of committing the crime to be, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946) (citations omitted). In determining the act or acts constituting the crime, we

have commonly focused on the verbs employed in the statute defining the offense. *See, e. g., United States v. Walden*, 464 F.2d 1015, 1018 (4th Cir. 1972); *Newton v. United States*, 162 F.2d 795, 796 (4th Cir. 1947). Finally, both the courts, *see, e. g., United States v. Johnson*, 337 F.2d 180, 194 & 194 n.22 (4th Cir. 1964), and Congress, 18 U.S.C. § 3237, have recognized that, when the crime is composed of distinct parts or is begun in one district and completed in another, venue may be proper in more than one district.

■■■ Applying these well-settled principles to the facts of this case, we must look first to the language of the false claims statute itself. That statute provides that any person who "makes or presents" a false claim to any agency of the United States is guilty of a crime. Thus, venue lies to prosecute a violator of this statute in either the district in which the claims were made or prepared, *see, e. g., United States v. Herberman*, 583 F.2d 222, 227 (5th Cir. 1978), or the one in which they were presented to the government, *see, e. g., United States v. Valenti*, 207 F.2d 242, 245 (3d Cir. 1953). Venue in the present case was therefore unquestionably appropriate in the District of Maryland in which the false claims were prepared or in the District of Columbia in which they ultimately came to rest with the GSA.

The defendants argue, however, that venue could not possibly lie in the Eastern District of Virginia, which the claims only "passed through." In support of their position, the defendants rely heavily on *Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), and *Reass v. United States*, 99 F.2d 752 (4th Cir. 1938). The courts in both these cases restricted venue solely to the district in which a false statement was actually submitted to or filed with a governmental agency. *Travis*, 364 U.S. at 635-37, 81 S.Ct. at 361-62 (venue restricted to District of Columbia in which union official required to file affidavit with NLRB declaring that he was not a communist pursuant to 29 U.S.C. § 159(h)); *Reass*, 99 F.2d at 753-55 (venue restricted to East-

ern District of Pennsylvania in which defendant hand delivered false statement for purpose of influencing action of Federal Home Loan Bank in violation of 12 U.S.C. § 1441(a)). However, the courts have narrowly construed *Travis* to apply only in the context of the unique statutory language dealt with in that case, *see, e. g., United States v. Natelli*, 527 F.2d 311, 326 (2d Cir. 1975), and in *Reass* we expressly refused to pass on the question "whether the offense would have been cognizable in West Virginia, if the defendant had entrusted the application to the mails in Wheeling for delivery to the bank in Pittsburgh," *Reass*, 99 F.2d at 755.

Neither the *Travis* nor the *Reass* court dealt with the clearly distinct context with which we are confronted in the present case, in which the false claim was submitted to an intermediary in one district who paid the claim and then transmitted a claim for reimbursement based on that payment, as a matter of course, to a government agency in another district. Presented with a similar factual situation, the Second Circuit has implied that venue is proper in either the district in which the false claim is submitted to the intermediary or the district in which the intermediary transmits the false claim to the agency. *United States v. Candella*, 487 F.2d 1223, 1227–28 (2d Cir. 1973). We are persuaded to the same result.

The last act taken by the defendants in committing the crime of submitting false claims to the government was the presentation of those claims to CSC at its Rosslyn, Virginia office with the knowledge that they would ultimately be transmitted to the GSA for payment. The possibility that the claims might have been misplaced or questioned by CSC short of submission to the GSA does not break the chain. Had either of these fortuities in fact taken place a violation of the false claims statute arguably would not have occurred. We, however, must view the commission of the offense in retrospect with the knowledge that neither of those fortuities, in fact, occurred and that the defendants submitted the false claims to CSC on the assumption and in the hope that they would not. *See DeRosier v.*

*United States*, 218 F.2d 420, 422 (5th Cir. 1955). Under these circumstances, we hold that venue properly lay in the Eastern District of Virginia.

III

The defendants next argue that the district court misapprehended the elements required for a conviction under 18 U.S.C. § 287 and that as a result of this misapprehension the court erroneously excluded certain evidence that the defendants sought to introduce in their defense and improperly instructed the jury. Icarus and Blecker first contend that section 287 prohibits only the submission of false claims directly to the government and that the district court therefore erred in instructing the jury that it could base a conviction on Icarus' submission of false invoices to the GSA through an intermediary such as CSC because Icarus had no direct contractual relationship with the government.

This constitutes an oversimplification of the scope of the false claims statute that has been rejected by every court that has considered the matter. For example, in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943), the Supreme Court was called upon to construe R.S. § 5438, the forerunner of section 287, which in addition to the present statute's prohibition of making or presenting false, fictitious or fraudulent claims to the government also prohibited the causing of another to make or present such claims. The Court in *Hess* held that, when private contractors engaged in collusive bidding practices on contracts made with local governmental units but for which a large portion of the funding was supplied by the federal Public Works Administration, the contractors were "causing to be presented" a fraudulent claim against the United States. *Id.* at 543–45, 63 S.Ct. at 383–85.

It may be contended that the present version of the false claims statute, from which Congress has deleted the "cause" language, precludes conviction of the defendants in the instant case on the theory of

*Hess.* The Reviser's Note to section 287, however, makes it clear that the "cause" language was omitted as unnecessary in view of Congress' enactment of 18 U.S.C. § 2(b), which provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Therefore, the "intermediary" theory of *Hess* remains good law and has since been applied in a number of cases. *See, e. g., United States v. Beasley,* 550 F.2d 261, 271–74 (5th Cir. 1977) (false claim submitted to local governmental unit under contract for which funds were supplied by HEW); *United States v. Catena,* 500 F.2d 1319, 1322–23 (3d Cir. 1974) (false claim submitted to private insurance carrier who sought reimbursement from HEW).

*Lowe v. United States,* 141 F.2d 1005 (5th Cir. 1944), on which the defendants rely, is not to the contrary. In *Lowe,* the Fifth Circuit reversed the conviction of an employee upon a charge that he had violated the false statements statute by making a false statement of his hours to his employer, a private corporation engaged in building ships under a contract to the United States Maritime Commission that called for reimbursement of the wages paid by the employer. The court held that "the mere allegation of the existence of the contract providing for reimbursement of payroll payments was not sufficient to make appellant's alleged fraudulent misrepresentation to his employer an offense against the United States." *Id.* at 1006.

*Lowe* has been twice distinguished from cases similar to the present one, however, on the ground that there was no showing in that case that the employee submitted his false statement of hours with knowledge that his employer would receive reimbursement from the government for the wages paid on the basis of that statement. *United States v. Candella,* 487 F.2d at 1226–27; *Ebeling v. United States,* 248 F.2d 429, 435 (8th Cir. 1957). In the present case, on the other hand, there was substantial evidence that Icarus submitted invoices for hourly rates based on falsified resumes with knowledge that CSC would seek reimbursement for the payment of the invoices from the GSA. This evidence amply supported the government's charge that Icarus and Blecker. violated section 287 by submitting false claims to the government through an intermediary, and we find that theory of prosecution to be consonant with the language and meaning of the false claims statute.

The defendants' next contention with respect to misapprehension of section 287 is that the district court erred in excluding evidence proffered by the defendants that the government got its money's worth for the consultant services performed by Icarus and in refusing to instruct the jury that it must find that the government did not receive adequate value for the money expended on work performed by Icarus in order to convict the defendant of a violation of the false claims statute. This *quantum meruit* argument is simply a restatement of the contention that conviction for violating section 287 requires a showing of specific intent to defraud the government—a contention that we rejected in *United States v. Maher,* 582 F.2d 842 (4th Cir. 1978). As we stated in *Maher,* section 287 is phrased in the disjunctive, and a conviction under that statute may therefore be based on proof that a claim submitted to the government is either false, fictitious *or* fraudulent. *Id.* at 847; *accord, United States v. Milton,* 602 F.2d 231, 233 (9th Cir. 1979) (relying on *Maher*); `Boushea v. United States,* 173 F.2d 131, 135 (8th Cir. 1949). Thus, the government met its burden of proof in this case by showing that the defendants submitted invoices to CSC with knowledge of their falsity, and evidence that the government got its money's worth was no defense to this proof.

The defendants' final substantive challenge to their conviction under section 287 is the assertion that the claims submitted to the government were not false. In reliance on our recent decision in *United States v. Race,* 632 F.2d 1114 (4th Cir. 1980), they argue that the NTS contract between the GSA and CSC only required CSC to provide

computer services of a particular character and quality and that, those services having been provided, CSC was free to and did pay its subcontractors at greater and lesser rates than that at which it was paid by the GSA. A brief comparison of the facts in *Race* with those of the present case, however, suffices to demonstrate why we reversed the convictions in the former but now affirm these.

In *Race*, the defendants were executives of a corporation that had contracted to provide certain engineering services to a Naval operational unit in the Navy's Southeastern Region. Under the contract, when employees of the corporation were required to perform services for the Navy more than fifty miles from Charleston, South Carolina, the corporation was entitled to claim per diem for those employees at the rate of $33 per day. The government alleged that the defendants had violated the false statements statute, 18 U.S.C. § 1001, by submitting claims for per diem at the rate of $33 per day while actually paying their employees per diem at the rate of $25 per day. *Id.* at 1117. We reversed the convictions because of our agreement with the defendant's construction of the contract—of which the Navy at all times had knowledge—as one requiring payment of per diem in all cases at the rate of $33 and not merely reimbursement of the amount of per diem that the corporation actually paid its employees. *Id.* at 1118–21.

Like the corporation in *Race*, CSC was free here to pay its subcontractors at a rate higher or lower than that at which it was paid by the government. Under Schedule J of the NTS contract, however, CSC was to be paid at hourly rates based on the experience and educational background of the consultants performing the work, and it chose to pay for the work it subcontracted to Icarus on this same basis. Moreover, the government presented overwhelming evidence that Blecker knew that the provisions of Icarus' contract with CSC were simply reflective of CSC's prime contract with the GSA. Thus, Blecker knew that the cost of any false invoices submitted to CSC would be passed on to the GSA in the form of an invoice that was false according to the provisions of Schedule J.

The defendants argue, however, that the dominant component of Schedule J is the description of responsibilities and duties of which experience and educational background are but two possible methods of measurement. They point to a provision of the schedule permitting assignment of an individual to a job when his or her "education and background is other than specified" so long as the "specific experience meets the Government's needs." They then contend that Icarus was entitled to the rates that it billed to CSC because, while its employees did not meet the experience or educational background requirements for those rates, they did fall within the "specific experience" proviso inasmuch as they were the only ones qualified to run a computer program perfected by Icarus and used for the benefit of the GSA.

This cannot operate as a defense to the defendants' conviction under section 287. Regardless of the special qualifications of Icarus' employees, the evidence presented at trial showed that, rather than rely on those special qualifications, Blecker puffed or instructed others to puff the resumes of his employees with false information about their education and experience and that these resumes served as the basis for the hourly rates charged in the invoices submitted to CSC and, in turn, to the GSA. Because the resumes were false, the claims that they were used to justify were also false, and this evidence was sufficient to convict the defendants of violating section 287.

## IV

The defendants next contend that they were denied a fair trial on the false claims charge as a result of the improper remarks of the prosecutor in his closing argument to the jury. Although the defendants make brief reference to a number of the prosecutor's remarks, we find it necessary to comment on only one. In discussing the false claims submitted by the defendants, the prosecutor stated that, while Blecker paid his employees at one rate,

"[w]e had to pay more." Viewing this statement as an appeal to the pecuniary interests of the jurors as taxpayers, defense counsel objected. The trial court sustained the objection and instructed the jurors at length that they should not view the case as if they had a personal stake in its outcome.

We recognize that appeals to the pecuniary interests of jurors are patently improper. *United States v. Smyth*, 556 F.2d 1179, 1185 (5th Cir. 1977); *United States v. Trutenko*, 490 F.2d 678, 679 (7th Cir. 1973). We must also take into account, however, the ambiguous use of "we," by which the prosecutor might well have meant only the government, in judging the possible effect of the prosecutor's remark on the jury. Moreover, the court's curative instruction was thorough, and unequivocally reminded the jurors of their duty to pass on the evidence without prejudice. Finally, it should be noted that this was not a close case. Upon consideration of this combination of mitigating factors, we conclude that the prosecutor's comment, while not to be condoned, did not constitute reversible error.

## V

Finally, Icarus challenges the sufficiency of the evidence to convict it of mail fraud in violation of 18 U.S.C. § 1341. The elements of the offense of mail fraud are (1) a scheme or artifice "for obtaining money or property by means of false or fraudulent pretenses" and (2) the mailing of a letter for the purpose of executing that scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The first element is supplied, of course, by the false claims violations. Icarus therefore questions only the sufficiency of the evidence to meet the second element.

It is clear from the evidence presented at trial that no mailing was involved in Icarus' submission of false invoices to CSC and CSC's use of the data contained in those invoices to in turn prepare and file with the GSA invoices for the services provided by Icarus. Icarus therefore argues that the mailing on which its mail fraud conviction was based could not possibly have been "incident to an essential part of the scheme" as required by the Supreme Court in *Pereira*. *Id.*

Icarus' argument, however, is premised on a construction of the scope of the mail fraud statute that is far too narrow. The requisite relation of mailings to the fraudulent scheme "does not turn on time or space, but on the dependence in some way of the completion of the scheme or the prevention of its detection on the mailings in question." *United States v. LaFerriere*, 546 F.2d 182, 187 (5th Cir. 1977). The present case is not one in which the mailings took place after the object of the scheme had been accomplished, *see, e. g., United States v. Maze*, 414 U.S. 395, 402, 94 S.Ct. 645, 649, 38 L.Ed.2d 603 (1974), or before the scheme had commenced, *United States v. Tarnopol*, 561 F.2d 466, 471–73 (3d Cir. 1977). Nor is it a case in which the mailings were merely incidental and might, in fact, be regarded as in conflict with the scheme. *See, e. g., United States v. Staszcuk*, 502 F.2d 875, 880–81 (7th Cir. 1974).

While the mailings in this case did take place after the false claims had been submitted to the GSA, they were a prerequisite to the payment of Icarus for those false claims, which was the ultimate object of the scheme to defraud. Mailings that occur subsequent to the commission of fraudulent acts by the defendants but which relate to the acceptance of the proceeds of the scheme have been upheld as the predicate for mail fraud convictions. *See, e. g., United States v. Rauhoff*, 525 F.2d 1170, 1176 (7th Cir. 1975); *United States v. Isaacs*, 493 F.2d 1124, 1151–52 (7th Cir. 1974). The mailings in this case fit squarely within that mold.

Icarus contends, however, that its case is distinguishable because the mailings involved were intracorporate ones from CSC's Rosslyn, Virginia office to its accounting office in El Segundo, California. "Ordinarily, charges of violations of section 1341 will not be predicated upon innocent corporate mailings in the ordinary course of the day to day business of the corporation." *United States v. Brickey*, 296 F.Supp. 742, 749 (E.D.Ark.1969). We have recognized,

however, that where, as here, a defendant has a reasonable basis to foresee that the mails will be used by others in the execution of a scheme to defraud, those mailings may serve as the basis for the defendant's conviction under section 1341. *United States v. Perkal*, 530 F.2d 604, 606–07 (4th Cir. 1976). Thus, while the internal CSC mailings may have been otherwise innocent, Icarus had knowledge that those mailings were an integral part of its scheme to obtain money for its false claims for computer consultant services. We therefore uphold the use of those mailings as the predicate for Icarus' conviction of violating 18 U.S.C. § 1341.

*AFFIRMED.*