**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

    v.

JAMES E. JACKSON,

    *Defendant-Appellant.*

No. 09-4753

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:09-cr-00126-WMN-1)

Argued: May 11, 2010

Decided: June 24, 2010

Before KEENAN, Circuit Judge, HAMILTON, Senior
Circuit Judge, and Samuel G. WILSON, United States
District Judge for the Western District of Virginia,
sitting by designation.

Affirmed by published opinion. Judge Wilson wrote the opinion, in which Judge Keenan and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** Steven F. Wrobel, ROSENBERG, MARTIN, GREENBERG, LLP, Baltimore, Maryland, for Appellant.

Jonathan Biran, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

WILSON, District Judge:

This is an appeal by James E. Jackson following Jackson's conditional guilty plea pursuant to a plea agreement to three counts of a twenty count indictment alleging violations of 18 U.S.C. § 1001 for making false statements on "a matter within the jurisdiction of the executive, legislative, or judicial branch of the Government." Jackson unsuccessfully moved to dismiss the indictment in the district court. Jackson's false statements consisted of his submissions of false timesheets to his employer, Northrop Grumman Corporation ("NG"), a subcontractor for the prime contractor, Computer Sciences Corporation ("CSC"), on a time-and-materials contract with the National Security Agency ("NSA"). Jackson contends that these statements were not made in relation to a matter within the jurisdiction of the executive branch because, under the circumstances, NSA had no power to exercise authority. We reject Jackson's argument and affirm.

I.

A grand jury of the United States District Court for the District of Maryland indicted Jackson on twenty counts of violating 18 U.S.C. § 1001 for submitting false timesheets to his employer, which ultimately resulted in the expenditure of NSA funds. Jackson moved to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3) on the ground that it failed to allege an offense over which the United States has jurisdiction. Jackson argued that his submis-

sion of "inaccurate timesheets to his employer, which in turn was a subcontractor to a general contractor to a United States agency, were not statements 'within the jurisdiction of any department or agency of the United States under 18 U.S.C. § 1001.'" (J.A. 12.) The district court denied the motion, finding that the expenditure of NSA's funds was sufficient to invoke NSA's jurisdiction. (J.A. 206.) According to the district court, "the agency's ultimate duty to safeguard the proper spending of federal funds" provides the required jurisdictional nexus. (J.A. 206) (quoting *United States v. Ross*, 77 F.3d 1525, 1544 (7th Cir. 1996)). The district court found NSA's "power to exercise authority" further augmented by its authority to revoke Jackson's security clearance, thereby denying him access to the work site (a NSA facility), as well as by its authority to terminate its contract with CSC. (J.A. 207.)

Following the denial of his motion to dismiss, Jackson entered into a plea agreement with the United States that called for Jackson to enter a conditional guilty plea to three of the twenty counts, while preserving his right to contest on appeal the district court's order denying his motion to dismiss the indictment. (J.A. 214.) Jackson then pled guilty pursuant to the plea agreement, and the district court received a stipulation of facts in support of the plea, which the parties further stipulated were not all the facts the government would have proven had the case proceeded to trial on a plea of not guilty.

According to the stipulation, at all relevant times NSA has been a component of the United States Department of Defense, which is part of the executive branch of the United States Government. In or about July 2003, NSA contracted with CSC to obtain certain messaging services. CSC provided those services under the terms of a time-and-materials contract (the "Contract"). CSC entered into a subcontract with a division of NG pursuant to which NG employees worked on the Contract. NG employed Jackson to work on the Contract at NSA headquarters at Fort George G. Meade, Maryland. The NSA Associate Directorate for Security and Counterintel-

ligence ("NSA Security") granted Jackson access to the NSA site.

NG paid Jackson based on timesheets that Jackson submitted electronically every two-weeks. Those timesheets were supposed to reflect the hours that Jackson worked on the Contract during each pay period. Based in part on the hours that Jackson recorded on his timesheets, NG periodically invoiced CSC for the hours worked on the Contract. CSC, in turn, periodically invoiced NSA for the hours that Jackson reported working. NSA paid CSC for the hours, and CSC paid NG, which paid Jackson.

Between September 2004 and January 2007, Jackson submitted numerous false timesheets to NG claiming that he worked approximately 834 hours more than he actually worked on the Contract. CSC ultimately invoiced NSA for the hours Jackson falsely claimed to have worked and this led to NSA paying CSC for work Jackson did not perform. The government contends that this caused NSA to pay approximately $75,150 for unperformed work. Jackson disputes this amount, but acknowledges that the overpayment was between $30,000 and $70,000.

NSA did not learn of Jackson's unworked hours until after it had already paid CSC for those hours, and after CSC in turn had already paid NG for them. According to the stipulation, if NSA had determined that the terms of the Contract were not being met, NSA's contracting officer would have worked directly with CSC's contracting office to determine how best to address the problem. If CSC failed to remedy the timesheet issue, NSA would have had the option of either terminating the Contract with CSC or demanding repayment from CSC for hours Jackson did not work. If an NSA auditor had received an allegation that Jackson was not working the hours he claimed in his timesheets, the auditor would have had the authority to obtain timesheets and billing records in order to

determine the amount of overpayment so that NSA could seek to recoup that amount from CSC.

By the time NSA's Office of Inspector General began its investigation of Jackson's timesheets, he was no longer working on the Contract due to a "reduction in force." If, at any time while he was still working on the Contract, NSA Security had learned that Jackson had not actually worked all of the hours he had claimed in his timesheets, NSA Security could have suspended or revoked his access to NSA facilities and information. This would have prevented Jackson from performing any additional work on the Contract.

Jackson pled guilty to three counts involving three pay periods in July and August of 2006. For that period, Jackson falsely claimed to have worked a total of sixty-two and a half hours that he did not actually work. NG invoiced CSC for those hours, and CSC in turn invoiced NSA for them.

## II.

Jackson argues that NSA was created by executive order, not by statute, and that therefore, it has "no statutory basis" to access his timesheets. It follows, he contends, that absent statutory authority "a key underpinning to the government's rationale is clearly missing from this case and [the] conviction should be reversed." (Appellant's Brief at 10-11.) We find this reasoning flawed on a number of levels, reject it, and find that Jackson's falsified timesheets, which ultimately were invoiced by CSC to NSA, are matters within the jurisdiction of the executive branch under § 1001.

Section 1001(a) makes it a crime to knowingly and willfully make a materially false, fictitious, or fraudulent statement or representation "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." The Supreme Court has held that the "within the jurisdiction" language of the statute "merely

differentiates the official, or authorized functions of an agency or department from matters that are peripheral to the business of that body." *United States v. Rodgers*, 466 U.S. 475, 479 (1984). Accordingly, "the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001." *Id.* at 480. The term refers to the department's or agency's "power to exercise authority in a particular situation," *id.* at 479, and that power need not include the power to make "final or binding determinations." *Id.* at 482.

Before applying that practical, non-technical standard to the particular situation at hand we note that Jackson's argument, which focuses exclusively on NSA's authority in relation to his falsified timesheets, does not properly frame the issue. In 1996, Congress amended the "jurisdictional" element of § 1001. *See* False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459 (codified as amended at 18 U.S.C. § 1001 (2006)). The previous version specified that the matter pertaining to the false statement must be "within the jurisdiction of any department or agency of the United States." The 1996 amendment, however, "broadened the scope of the statute to include any matter 'within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.'" *United States v. Atalig*, 502 F.3d 1063, 1067 (9th Cir. 2007). In light of the amendment, the question of jurisdiction here, when properly framed, is whether Jackson's falsified timesheets "fell within the jurisdiction of the executive branch." *Id.* at 1068. We conclude that they did.

In concluding that Jackson's false timesheets fell within the jurisdiction of the executive branch, we note first that we think it plain that the executive branch has the authority (if not the duty) not to pay a false invoice, no matter through how many intermediaries' hands it passes.[1] This constitutes a

---

[1]Jackson cannot do indirectly that which he is prohibited from doing directly. 18 U.S.C. § 2(b) provides that "whoever willfully causes an act

substantial power to act, and other circuits have long reached essentially similar conclusions. *See United States v. Ross*, 77 F.3d 1525, 1543 (7th Cir. 1996) ("[T]he jurisdictional nexus between the agency and the entity for purposes of § 1001 stems from the agency's ultimate duty to safeguard the proper spending of federal funds.") (citing, *inter alia*, *United States v. Stanford*, 589 F.2d 285, 297 (7th Cir. 1978) ("It is the general rule . . . that a statement may concern a matter within the federal jurisdiction described in section 1001, even if the statement is not submitted directly to the federal department or agency involved, and the federal agency involvement is limited to reimbursement of expenditures.")); *United States v. Gibson*, 881 F.2d 318, 323 (6th Cir. 1989) ("Protecting itself against being wrongfully overcharged is clearly an 'official, authorized function[ ]' of [a governmental agency], not a 'matter[ ] peripheral to the business of that body.'") (citing *Rodgers*, 466 U.S. at 479); *United States v. Facchini*, 874 F.2d 638, 643 (9th Cir. 1989) (finding jurisdiction when defendants submitted false statements to a state agency, but ultimately "gained . . . benefits paid out of the federal fisc . . ."); *United States v. Wolf*, 645 F.2d 23, 25 (10th Cir. 1981) (Jurisdiction exists when "[t]he federal government . . . either partially funds the program under which the undeserved benefits are requested or reimburses the agency for its expenditures.") (citing *United States v. Baker*, 626 F.2d 512, 514 n.5

---

to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." As we explained in the context of another § 1001 case, "this section is intended 'to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged . . . .'" *United States v. Richeson*, 825 F.2d 17, 20 (4th Cir. 1987) (quoting *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir. 1983)). We also have recognized that an intermediary theory of liability applies to offenses under 18 U.S.C. § 287, which prohibits the knowing presentation of a false, fictitious, or fraudulent claim to any agency or department of the United States. *See United States v. Blecker*, 657 F.2d 629, 633-34 (4th Cir. 1981).

(5th Cir. 1980) ("[T]he necessary link between deception of the non-federal agency [or private company] and effect on the federal agency is provided by the federal agency's retention of the ultimate authority to see that the federal funds are properly spent.") (citation omitted)); *United States v. Candella*, 487 F.2d 1223, 1226 (2d Cir. 1973) (finding jurisdiction when "[t]he United States became ultimately responsible for paying 100%" of the false invoice). Accordingly, we do not consider the authority to safeguard federal funds to be merely peripheral, but rather an official, authorized function of the executive branch.

While we think that the executive branch's authority to safeguard federal funds is a sufficient jurisdictional nexus on its own, in this case that link is augmented by other, even more direct controls that the executive branch exercised over Jackson. Specifically, it had the power to revoke Jackson's security clearance and his access to his NSA job site and ultimately to terminate its contract with CSC. Indeed, Jackson was only able to work on this project for NG because he was authorized to do so by NSA Security. Taken together, the power to safeguard federal funds and the ability of the executive branch to effectively terminate Jackson's employment on the Contract provide an ample basis to find federal jurisdiction.

Jackson relies heavily on three cases: *Lowe v. United States*, 141 F.2d 1005 (5th Cir. 1944), *United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), and *United States v. Facchini*, 874 F.2d 638 (9th Cir. 1989). *Lowe* and *Blankenship*, however, are distinguishable from this case, and *Facchini* actually supports the Court's reasoning here.

In *Lowe*, the defendant was an hourly employee of a ship building company that was contracted by the United States to build ships. The defendant submitted false timesheets to the company, which paid him directly, but the company was ultimately reimbursed for the time by the United States. The

*Lowe* court found that "[i]nsofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any governmental agency of any kind." *Lowe*, 141 F.2d at 1006. The court also noted that the "contract for reimbursement of payroll payments . . . did not designate the payroll department of the company as an agency of the United States, nor did it place that department under the control or supervision of any such agency." *Id.* Accordingly, the court held that "the mere allegation of the existence of the contract providing for reimbursement . . . was not sufficient to make [the defendant's] alleged fraudulent misrepresentations to his employer an offense against the United States." *Id.*

In *Blankenship*, the defendants conspired to obtain road construction contracts that were federally mandated to be awarded to "disadvantaged business enterprises" ("DBEs"), that is, small companies owned by women or minorities. In that case, the United States Department of Transportation ("USDOT") gave a grant to the Florida Department of Transportation ("FDOT") for road construction that required at least 12% of the funds be awarded to DBEs. The FDOT, in turn, contracted with a large construction company, which subcontracted with an authorized DBE to perform some of the work. The owner of that DBE, who actually had no employees, then conspired with the owners of a non-DBE authorized company to do the work and receive payments from the primary contractor. To deceive the primary contractor, the defendants created numerous false documents and records, all giving the impression that employees of the DBE were performing the work. Relying heavily on *Lowe*, the court held that those "false statements . . . [were not] matters within the jurisdiction of the federal government." *Blankenship*, 382 F.3d at 1136. The court found that the USDOT had no direct control over the defendants, and that all the agency could do once it learned of the false documents was "to pressure the FDOT, under the terms of the FDOT's contract . . . into pressuring [the primary contractor] into taking some sort of action." *Id.*

According to the court, "[t]his embarrassingly weak and indirect avenue of recourse demonstrate[d] the USDOT's lack of authority, and hence lack of jurisdiction, over . . . the defendants." *Id.*

In both of these cases, the court reversed the defendants' convictions under § 1001 (or its predecessor in the *Lowe* case), finding a lack of federal jurisdiction. We find both cases distinguishable, however, and to the extent that they cannot be distinguished, we follow the majority of circuits.

In *Lowe*, the court highlighted the fact that the defendant's employment was entirely unaffected by the existence of the federal contract. In contrast, here NSA Security had the power to revoke Jackson's clearance (and his access to the work site), terminating his ability to work on the Contract at any time, and NSA had the power to terminate its Contract with CSC (and therefore NG) if it had discovered the fraudulent activity. Consequently, the circumstances here are quite unlike the circumstances in *Lowe* where "every aspect of [the defendant's] employment was exactly the same as it would have been had there been no contract with any governmental agency of any kind." *Lowe*, 141 F.2d at 1006. For similar reasons this case is distinguishable from *Blankenship*, where the USDOT's power to act on the fraudulent documents submitted by the defendants was, in the words of the *Blankenship* court, "embarrassingly weak and indirect." *Blankenship*, 382 F.3d at 1136. Accordingly, we find neither case directly analogous to the case before this Court.[2]

Jackson also relies on *United States v. Facchini* in support of his position. His reliance, however, is misplaced. *Facchini*

---

[2]We note that, to the extent that *Lowe* is similar to this case, nearly every court to consider it has either distinguished it or rejected it. *See Blankenship*, 382 F.3d at 1145-48 (Black, J., concurring in part and dissenting in part) (explaining that even within the Fifth and Eleventh Circuits, *Lowe* is inconsistently followed, and often distinguished).

concerns false statements made by defendants to the Oregon Division of Employment to receive unemployment insurance benefits. The Oregon program paid benefits primarily with state funds, but received administrative funds and guidelines from the Department of Labor ("DOL"). The court in that case analyzed two separate groups of defendants: those who received money only from the State of Oregon, and those who received supplemental benefits from the DOL. Though it is true that the court found no jurisdiction as to the first group because the connection to the federal government was too attenuated, it easily found jurisdiction to exist for the second, namely "because [the defendants'] false statements gained them benefits paid out of the federal fisc . . . ." *Facchini*, 874 F.2d at 643. There the court found, as do we, that "there is a direct relation between the falsity of [the] statements and the [federal government's duty] of certifying the payment of federal money . . . ." *Id.* Therefore, *Facchini* actually supports the conclusion that we reach today.

## III.

For the reasons stated, we find that Jackson's false statements on his timesheets, which were transmitted to CSC, and from CSC to NSA, and ultimately paid by NSA, are matters within the jurisdiction of the executive branch under § 1001, and accordingly affirm the decision of the district court.

*AFFIRMED*