Vacated by Supreme Court, June 20, 2005

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

v.

AGNES HOLBROOK,
　　　　　　　*Defendant-Appellant.*

No. 02-4844

Appeal from the United States District Court
for the Western District of Virginia, at Big Stone Gap.
James P. Jones, District Judge.
(CR-01-10023)

Argued: February 27, 2004

Decided: May 20, 2004

Before WILLIAMS, KING, and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the opinion, in which Judge Duncan joined. Judge King wrote a separate dissenting opinion.

---

## COUNSEL

**ARGUED:** Anthony Elmer Collins, Wise, Virginia, for Appellant. Eric Matthew Hurt, Assistant United States Attorney, Newport News, Virginia, for Appellee. **ON BRIEF:** John L. Brownlee, United States Attorney, Roanoke, Virginia, for Appellee.

---

**OPINION**

WILLIAMS, Circuit Judge:

On March 24, 2001, Agnes Holbrook shot to death her estranged husband, Larry Lee Holbrook. Shortly thereafter, a grand jury sitting in the Western District of Virginia charged Holbrook in a two-count indictment with violating 18 U.S.C.A. § 922(g)(9) (West 2000) (Count One) and 18 U.S.C.A. § 922(a)(6) (West 2000) (Count Two) in connection with the shooting. After a jury had been empaneled and evidence presented as to both counts, Holbrook decided to enter into a plea agreement with the Government, under which she agreed to plead guilty as to Count One in exchange for a number of promises from the Government, including its promise to dismiss Count Two. After Holbrook breached the plea agreement by attempting to withdraw her guilty plea, the Government elected to forego its promise to dismiss Count Two and to oppose any attempt by Holbrook to withdraw her guilty plea as to Count One. The district court found this remedy permissible under the plea agreement, and the case proceeded to trial on Count Two, after which a second jury found Holbrook guilty. On appeal, Holbrook argues that the Government's election of remedies violates due process because, Holbrook asserts, she was held to her end of the bargain, while the Government was free not to perform its end of the bargain. Holbrook also argues that the second jury trial on Count Two violated the Double Jeopardy Clause of the Constitution, and that the district court erred at sentencing in finding that she had acted with malice in killing her husband. For the reasons that follow, we affirm.

I.

A.

The facts are taken from Holbrook's Presentence Investigation Report (PSR), which the district court adopted as its factual findings at sentencing, as well as evidence adduced at trial and at sentencing. We accept these findings as true unless we find them to be clearly erroneous. *United States v. Stockton*, 349 F.3d 755, 764 (4th Cir. 2003).

The charges against Holbrook in this case arise out of the March 24, 2001, shooting death of her husband, Larry. In the months prior to March 2001, Holbrook and Larry had separated and had become embroiled in a bitter divorce. Both had filed motions for protective orders against each other on numerous occasions, Larry had started a relationship with another woman, Stephanie Gibson, and he had told several individuals that he was removing Holbrook as a beneficiary of his government benefits and life insurance policies. On February 19, 2001, Holbrook purchased a .22 caliber pistol from a federally licensed firearms dealer in Pennington Gap, Virginia. In filling out the required screening paperwork, Holbrook indicated that she never had been convicted of a misdemeanor crime of domestic violence, an offense that disqualifies persons from possessing firearms, *see* 18 U.S.C.A. § 922(g)(9). In fact, she previously had been convicted of assaulting her former husband, Clay Phillips, with a knife. Because Holbrook committed this prior offense when her name was Agnes Bernice Phillips, the record check performed by the dealer did not reveal the conviction, and the dealer sold her the firearm. After test-firing the pistol several days after purchasing it, Holbrook determined that the gun was in need of repairs and had a friend return it to the dealer.

A few weeks later, on March 5, 2001, Holbrook lost her job. Her employer, the Department of Social Services for Lee County, Virginia, forced her to resign after discovering that she had lied on her job application about her criminal history. Holbrook believed that her employer had made this discovery as the result of a tip from Larry.

That same day, Holbrook set out to acquire a second firearm. Almost immediately after resigning from work, Holbrook called a friend, Jason Gibson (the estranged husband of Larry Holbrook's paramour, Stephanie Gibson), to inquire about obtaining a firearm. Gibson eventually took Holbrook to the residence of his cousin, Steve Wuderman, who sold Holbrook a .357 magnum handgun. Wuderman was not a licensed firearms dealer. Holbrook test-fired the weapon, made payment arrangements, and left the Wuderman residence with Gibson.

On March 24, 2001, Holbrook used the .357 magnum to shoot and kill Larry in a dispute in the bedroom of her home. The precise details

of the shooting remain somewhat a mystery because Holbrook was the only witness to the shooting, and, as explained below, her version of events has changed significantly over time. Some facts about the events of that date, however, are undisputed. First, record evidence indicates that on the date of the shooting, Larry had been seen in a light-hearted mood, and he had told someone that he was going to pick up his kids to go play ball. Second, although it is unclear from the evidence why Larry drove to Holbrook's residence on March 24, the evidence does show that Larry had a firearm in his car when he arrived at the Holbrook residence and that he left that firearm in the car when he went inside. Finally, evidence in the record shows that Holbrook did not call the police until shortly after 6:00 pm, although neighbors testified that they heard a single gun shot between 4:00 pm and 4:45 pm.

Initially, Holbrook told investigators that Larry had committed suicide in front of her. The investigators' examination of the forensic evidence, however, led them to question Holbrook's truthfulness. For example, their investigation found that Larry Holbrook had no gunpowder residue on his hands and his fingerprints were not found on the weapon; Larry's body had been moved at least three times after death; and evidence indicated that the murder weapon had been wiped clean.

Later, at her first trial, and only after being confronted with the forensic evidence described above, as well as evidence linking the murder weapon to her, Holbrook admitted that she had shot Larry. According to Holbrook's trial version of events, Holbrook exited the bathroom of her home, and saw Larry standing in the hallway with her .357 magnum, which, Holbrook explained, Larry must have found in its hiding place behind her dresser mirror. Larry then threatened to kill her and a stand-off ensued. The couple ended up in the bedroom with Larry on his knees on the floor and Holbrook on the bed. When Larry laid the pistol on the bed, she grabbed the weapon and shot Larry once in the face in an act of self-defense.

At her second trial, Holbrook recanted much of this version of events, testifying that although she may have killed Larry, she had no recollection of exactly what happened.

B.

On April 25, 2001, a grand jury sitting in the Western District of Virginia charged Holbrook in a two-count indictment with violating 18 U.S.C.A. § 922(g)(9) by possessing the .357 magnum after having been convicted of a misdemeanor crime of domestic violence (Count One) and 18 U.S.C.A. § 922(a)(6) by making false statements to a firearms dealer in connection with her purchase of the .22 caliber pistol from the federally licensed firearms dealer (Count Two). The Government tried Holbrook before a jury on these charges from August 21-23, 2001. At the close of the third day of trial, after the district court ruled that Holbrook could not raise a justification defense in response to the charges, Holbrook, represented by counsel, entered a plea of guilty as to Count One pursuant to a written plea agreement (the Agreement) with the Government, under which Holbrook agreed to plead guilty as to Count One in exchange, *inter alia*, for the dismissal of Count Two. After a Rule 11 plea colloquy during which the district court reviewed the terms of the Agreement with Holbrook and her counsel, the district court accepted her plea and approved the Agreement.

Several months later, after the entry of her guilty plea but prior to sentencing, Holbrook fired her trial counsel and hired new counsel, and on November 5, 2001, filed a motion for leave to withdraw her guilty plea. In a letter dated November 7, 2001, the Government informed Holbrook that it considered any motion to withdraw her guilty plea to be a breach of the Agreement, but that it was not renouncing the Agreement or declaring it void. The Government explained that it intended to hold Holbrook to her guilty plea as to Count One, and instead of dismissing Count Two of the indictment, it would retry Holbrook on that count. The Government further explained that it took these actions pursuant to the Agreement.

Six months later, the district court took evidence on Holbrook's motion to withdraw her plea, and on May 9, 2002, denied the motion.[1]

---

[1]Applying our holding in *United States v. Moore*, 931 F.2d 245 (4th Cir. 1991), the district court rejected Holbrook's contentions that she lacked mental capacity at the time of her plea and that she had a viable defense to Count One. Holbrook does not challenge this ruling on appeal.

The Government then moved to continue sentencing as to Count One, so that it could first try Holbrook on Count Two. On June 14, 2002, the district court held a hearing on the Government's motion, granted it, and, on June 25, 2002, the district court memorialized its decision in an opinion. *See United States v. Holbrook*, 207 F. Supp. 2d 472 (W.D. Va. 2002). The district court explained that the remedy pursued by the Government was allowed by Paragraph D(g) of the Agreement, which granted the Government the authority to "refuse to abide by any sentencing or other stipulations" in the Agreement, including its promise to dismiss Count Two. *Id.* at 475.

On July 12, 2002, Holbrook filed a motion to dismiss Count Two on the ground that trying her under that count would be a violation of her rights under the Double Jeopardy Clause because a jury previously had been empaneled and heard evidence on that count. On July 22, 2002, immediately prior to the commencement of the second trial, the district court denied this motion on the record, explaining that Holbrook effectively waived the defense of double jeopardy upon execution of the Agreement. Holbrook was tried on Count Two from July 22-26, 2002, and found guilty.

The district court sentenced Holbrook on October 17, 2002. The only contested issue at sentencing concerned the application of § 2K2.1(c)(1)(B) of the Sentencing Guidelines. *See U.S. Sentencing Guidelines Manual* § 2K2.1(c)(1)(B) (2001). Specifically, the parties disputed whether to cross-reference to the guideline for second degree murder (U.S.S.G. § 2A1.2), or to the guideline for voluntary manslaughter (U.S.S.G. § 2A1.3). The Government argued that the second degree murder guideline applied because Holbrook acted with malice. The Government's view of the facts was that Holbrook set a trap for Larry on the day of his murder and then attempted to make the murder appear to be a suicide. Holbrook, in contrast, took the position that the voluntary manslaughter guideline should apply because the shooting was impulsive and was the result of the heat of passion. Holbrook's view of the facts was that Larry had come to her home that day, confronted her with the murder weapon, and threatened to kill her. Once the opportunity presented itself, Holbrook contended, she took the gun and shot Larry out of fear for her own safety.

Considering the evidence presented at the two trials, the facts presented in Holbrook's PSR, and evidence adduced at the sentencing

hearing, the district court found by a preponderance of the evidence that Holbrook acted with malice, and accordingly cross-referenced to the second degree murder guideline. The district court explained its reasoning as follows:

> I believe that her efforts, which have been documented to cover up the nature of the crime are highly circumstantial evidence of her malice in committing this crime. . . . I accept the evidence of the expert presented by the Government today that the body had likely been moved.

> I accept the evidence of the Government that the gun had been wiped clean, and placed under the deceased's hand, again in an effort, it reasonably appears, to indicate that he had killed himself.

> The fact that he had a gun in his vehicle, but did not bring it into the house negates the defendant's claim that he was the aggressor in this case. The fact, which I accept from the evidence, that the defendant had been seen earlier that day in a lighthearted mood, that he was not showing evidence of mental illness or other cause which would have caused him to want to kill her or himself, as she claims at one point he said he was going to do, the fact that she has changed her statements from the beginning over time, evidences to me a guilty conscience, an effort to escape responsibility.

> She certainly had motive for premeditation and malice, as the evidence has shown, without really any contradiction. The victim was considering changing her as his beneficiary, and that would have caused her to lose benefits.

> In addition, . . . I do not doubt that this was a rancorous divorce[.] [T]here's every evidence . . . that the defendant was at a point where she felt hostility toward her husband, and they had been the subject of, he had been the subject of her going to court on numerous occasions, and that there was certainly hostility there. . . .

I find that she did have malice in a legal sense, and that her shooting of her husband was not based on any sudden passion or rage sufficient to negate malice and make this crime voluntary manslaughter.

(J.A. at 892-95.) Applying the second degree murder cross-reference, the district court sentenced Holbrook to a term of 120 months incarceration as to Count One and a consecutive term of 90 months incarceration as to Count Two.

## II.

Holbrook raises three arguments on appeal. First, Holbrook argues that the district court deprived her of her constitutional rights when it interpreted the Agreement to allow the Government to refuse to dismiss and proceed to trial on Count Two, while refusing to relieve her of the consequences of her performance — *i.e.*, her plea of guilty to Count One. Second, Holbrook argues that the second trial on Count Two violated the Double Jeopardy Clause of the Constitution because a jury previously had been empaneled and heard evidence on that count. Third, Holbrook asserts that the district court erred in finding at sentencing that she acted with malice in killing Larry Holbrook. We address each argument in turn.

## A.

The interpretation of the terms of a plea agreement is a question of law that we review *de novo*. *United States v. Snow*, 234 F.3d 187, 189 (4th Cir. 2000). We construe plea agreements in accordance with principles of contract law so that each party receives the benefit of its bargain. *United States v. Ringling*, 988 F.2d 504, 506 (4th Cir. 1993). Under "ordinary principles of contract law," we enforce a contract's "plain language in its ordinary sense." *See Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313 (4th Cir. 2002) (internal quotation marks omitted). "[C]ourts do not write the contracts of parties retroactively, but merely construe the terms of the contract the parties have previously signed." *United States v. Race*, 632 F.2d 1114, 1119 (4th Cir. 1980). "Because a defendant's fundamental and constitutional rights are implicated when [s]he is induced to plead guilty by reason of a plea agreement," however, we must analyze a plea agree-

ment "with greater scrutiny" than would apply to a commercial contract. *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir. 1997). This heightened scrutiny is necessary because "a defendant's plea of guilty can truly be said to be voluntary only when 'the bargain represented by the plea agreement is not frustrated.'" *United States v. Peglera*, 33 F.3d 412, 413-14 (4th Cir. 1994) (quoting *United States v. Jureidini*, 846 F.2d 964, 965-66 (4th Cir. 1988)). Accordingly, we hold "the Government to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986).

Several terms in the Agreement are relevant to Holbrook's appeal. First, in Paragraph I, Holbrook and the Government agreed that the Government's duty to dismiss Count Two of the indictment was expressly conditioned upon Holbrook "meeting the conditions set forth in paragraph H of this agreement." (J.A. at 313.) In Paragraph H of the Agreement, Holbrook agreed:

> If I fulfill my obligations under this plea agreement and accept responsibility for my conduct, the United States will recommend that the Court grant me a reduction in my offense level for the appropriate level of acceptance of responsibility under the sentencing guidelines.
>
> However, *I hereby agree and stipulate that if I do any of the following*, I should not receive credit for acceptance of responsibility and *the United States will be free to* make any recommendations it wishes at sentencing or to *declare a breach of this plea agreement and seek the remedies set forth in paragraph D*: (1) attempt to withdraw my guilty plea . . . .

(J.A. at 313 (emphases added).)

Holbrook concedes that she materially breached the Agreement by attempting to withdraw her guilty plea as to Count One, but she argues that the remedy imposed by the district court for this breach — retaining her guilty plea to Count One and trying her on Count Two — was authorized neither by the terms of the Agreement nor traditional principles of contract law, and that as a result, the remedy

violated her constitutional due process rights. Specifically, Holbrook
asserts that, under the terms of the Agreement and as a matter of con-
tract law, the only way the Government could try her on Count Two
of the indictment was to declare the entire Agreement void. By allow-
ing the Government to try her on Count Two without first voiding the
Agreement, Holbrook contends, the district court frustrated the bar-
gain as she perceived it — the Government received its principal ben-
efit, her plea of guilty as to Count One, while she was denied her
principal benefit, the dismissal of Count Two. Holbrook, in short,
asks us to determine whether the Agreement permitted the remedy
that the district court enforced.

By its own terms, the Agreement is comprehensive, and provides
the Government with a broad range of remedies in the event of a
breach by Holbrook. Paragraph D, entitled "Remedies for Breach of
Plea Agreement," identifies this broad range of remedies and provides
in pertinent part as follows:

> I understand that *if I breach any provision* of this agreement,
> at any time, that *the United States Attorney's office may, at
> its election, pursue any or all of the following remedies*: (a)
> declare this plea agreement void and proceed to trial; . . . (g)
> refuse to abide by any other sentencing or other stipulations
> contained in this plea agreement; (h) take any other action
> provided for under this agreement or by statute, regulation
> or court rule. *The remedies set forth above are cumulative,
> and not mutually exclusive.*

(J.A. at 312 (emphases added).)

Thus, under Paragraph D, the Government retained the ability to
pursue many different remedies, alone or in combination, in the event
of a breach. Three of those remedies are relevant here. First, Para-
graph D(a) permitted the Government to "declare th[e] plea agree-
ment void and proceed to trial."[2] (J.A. at 312.) Paragraph D(a) is the
only remedy that negates the plea of guilty as to Count One, which

---

[2]Our colleague in dissent labels this remedy the "Trial Remedy," *post*
at 17, but as the only remedy that allows the Government to void the
agreement, the label, "Voiding Remedy," is perhaps more apt.

lies at the very heart of the plea agreement. Should this remedy be pursued, the parties would be restored to the status quo ante the Agreement, with Holbrook asserting pleas of not guilty as to both Count One and Count Two, and the Government preparing to try her on those counts. By using the phrase "proceed to trial" in Paragraph D(a), the parties agreed that the Government would not dismiss the counts, but rather would try Holbrook on those counts. As noted above, the Government declined to pursue this remedy.

Although Paragraph D(a) uses the phrase, "proceed to trial," it is not, as Holbrook contends (and our colleague in dissent agrees[3]) the only way in which the Government could "proceed to trial" under the Agreement.[4] The second such mechanism is found in Paragraph D(g),

---

[3]Our dissenting colleague suggests that our reading of the Agreement renders superfluous the phrase, "proceed to trial," in Paragraph D(a). We disagree. The fact that the Agreement provides alternative avenues for the Government to try Holbrook on Count Two in the event of her breach does not negate the fact that, should the Government elect to void the Agreement under Paragraph D(a), it would then take her to trial.

[4]Wholly apart from her argument that the terms of the contract require the Government to void the Agreement in order to try Holbrook on Count Two, Holbrook asserts that, as a matter of contract law, voiding the contract and restoration of the status quo ante is the only remedy available to the injured party when the other party breaches. To the contrary, contract law does not prevent an injured party from retaining the benefit of the contract up to the date of breach, while simultaneously pursuing other remedies for the breach. *See*, *e.g.*, 11 Arthur L. Corbin, *Corbin on Contracts* § 922 (1979) (in actions for breach of contract, the law seeks to put the nonbreaching party in the position in which he or she would have been absent the breach); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 506 (4th Cir. 1986) (finding that an injured party is able to realize his or her expectations from the contract as if there had been no breach). To hold otherwise potentially could create the anomaly of allowing the breaching party to improve his or her position by reason of the breach. Accordingly, the Government was not precluded from enforcing the remaining provisions of the Agreement by virtue of Holbrook's breach while retaining the benefit of Holbrook's pre-breach performance — *i.e.*, her plea of guilty on Count One. *See*, *e.g.*, *United States v. Scruggs*, 356 F.3d 539, 545 (4th Cir. 2004) (holding that, where defendant had breached a plea agreement, Government was allowed to rely on

under which the Government could "refuse to abide by any other sentencing *or other stipulations* contained in this plea agreement," (J.A. at 312 (emphasis added)), which would include its stipulation that it would dismiss Count Two.

Contrary to our colleague's view, we find that the term, "other stipulations," unambiguously includes all of the Government's obligations under the Agreement. We note first that the term, "stipulation," is not specifically defined by the terms of the Agreement. Although the heading of Paragraph J is "STIPULATIONS AND RECOMMENDATIONS," the text of that paragraph deals only with Holbrook's promise to assign her interest in Larry Holbrook's death benefits to Joshua and Dylan Holbrook. Paragraph J does not address any stipulation by the Government and does not purport to define the entire set of agreed-upon "stipulations" in the Agreement.

In its ordinary usage, the word "stipulation" is understood to mean "an act of stipulating or something stipulated" such as "a condition, requirement, or item specified in a contract." Webster's Third New International Dictionary 2245 (1986). Similarly, in its ordinary legal usage, the term is understood to mean "[a] material condition or requirement in an agreement." Black's Law Dictionary 1427 (7th ed. 1999). The parties use the term "stipulate" throughout the Agreement in a manner consistent with these definitions. For example, in Paragraph H, Holbrook stated, "I hereby agree and stipulate that if I do any of the following I should not receive credit for acceptance of responsibility and the United States will be free to make any recommendations it wishes at sentencing or to declare a breach of this plea agreement . . . ." (J.A. at 313.) Similarly, Paragraph K states that "[t]he parties stipulate that the proper cross-reference for any sentencing in this case is second degree murder . . . ." (J.A. at 314.) In sum, when the Agreement is read as a whole, it is clear that the term "stipu-

---

provision in the plea agreement that allowed it to use statements made by the defendant in cooperating with the Government pursuant to the plea agreement). Thus, the Government's pursuit of trial on Count Two in this case is not "crawfishing" as our colleague suggests, *post* at 28, but rather a permissible act authorized by well-established principles of contract law.

lation" includes the Government's conditional obligation in Paragraph I to dismiss Count Two should Holbrook fulfill her obligations.

Finally, Paragraph D(h) provided that the Government could "take any other action provided for under this agreement or by statute, regulation or court rule." (J.A. at 312.) An "other action" contemplated by the Agreement was the Government's ability to refuse to dismiss Count Two, as provided for by Paragraph I. Because, in attempting to withdraw her guilty plea, Holbrook did not perform her obligations under paragraph H, the Government's conditional duty to dismiss Count Two under Paragraph I never came due. *See Restatement (Second) of Contracts* § 225(2) ("[T]he non-occurrence of a condition discharges the duty when the condition can no longer occur."); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 8.3 (2d ed. 1998) (same).

Our dissenting colleague appears to agree that one of the Government's remedies in the event of a breach would be to refuse to dismiss Count Two, but he does not concede that, in such an event, a trial on Count Two is permitted. *See*, *e.g.*, *post* at 25 ("While a breach by Holbrook could support a decision by the United States Attorney not to dismiss Count Two, the Dismissal Clause neither addresses the issue of trial nor authorizes the Government to proceed to trial."). While the dismissal clause in Paragraph I does not include the words, "proceed to trial," Paragraph D(h), as noted above, allowed that the Government, at its election, could "take any other action provided for . . . by statute, regulation or court rule," and could do so cumulative to any other remedy. The trial of a criminal defendant on pending charges is an act unquestionably authorized by "statute, regulation or court rule." *See*, *e.g.*, 18 U.S.C.A. §§ 3161-74 (West 2000 & Supp. 2003) (The Speedy Trial Act). Thus, the plain language of the Agreement permitted for the Government to try Holbrook on Count Two after refusing to dismiss it.[5]

---

[5]We note further that, if the Government chose not to dismiss Count Two, but was precluded from proceeding to trial on Count Two, then Count Two, absent intervening circumstances, would be left in limbo, neither dismissed nor prosecuted. This result would violate the Speedy Trial Act, 18 U.S.C.A. §§ 3161-74 (West 2000 & Supp. 2003), which

Accordingly, under the broad, plain language of the Agreement, negotiated with the advice of counsel, reviewed and approved by the district court at Holbrook's Rule 11 plea colloquy, the Government retained the ability "*at its election*, [to] pursue any or all" of the listed remedies and explicitly provided that "[t]he remedies . . . [we]re cumulative, and not mutually exclusive." Thus, Holbrook's subsequent trial on Count Two was consistent with the plain language of the Agreement and thus was consistent with constitutional due process requirements. The Agreement unquestionably is favorable to the Government. Nevertheless, its unambiguous terms represent the bargain that Holbrook struck — a bargain that she struck, notably, on the advice of counsel, only after hearing the Government present to a jury its case as to both counts, and after the district court ruled that she could not present a justification defense. Holbrook sought to withdraw her guilty plea upon the advice of counsel, and did so despite a prompt and express warning from the Government that it would hold her to the terms of the Agreement and try her on Count Two while maintaining her guilty plea on Count One. Although our precedent requires us to hold the Government accountable for ambiguities in written plea agreements, it does not require us to create such ambiguities where there are none.[6]

---

requires the Government to try a defendant on any open counts within a certain period of time. Because we interpret contracts in light of the law existing at the time of execution, 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:7 (4th ed. 1999) (explaining that "the circumstances surrounding the execution of the contract bear upon the contract's meaning"); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.10 (2d ed. 1998) (explaining that "[t]he overarching principle of contract interpretation is that the court is free to look to all the relevant circumstances surrounding the transaction[,] [including] the state of the law . . . at the time [of execution]"), the necessary consequence of the elimination of the Government's duty to dismiss Count Two was a trial on that count.

[6]Contrary to our colleague's suggestion, *see post* at 27-28, our reading of the Agreement is fully consistent with our holding in *United States v. Smith*, 976 F.2d 861 (4th Cir. 1992). In *Smith*, we reversed the district court because it misapplied *Restatement (Second) of Contracts* § 212 in construing an unambiguous provision in an immunity agreement. *Id.* at

## B.

In her second argument on appeal, Holbrook asserts that the district court erred in failing to dismiss Count Two on the ground that it violated the Double Jeopardy Clause of the Constitution. We review questions of double jeopardy *de novo. United States v. Studifin*, 240 F.3d 415, 418 (4th Cir. 2001).

"The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States*, 437 U.S. 1, 11 (1978). But, when the initial jeopardy terminates at the defendant's behest, or on a basis unrelated to the sufficiency of the evidence of the defendant's guilt, the Double Jeopardy Clause generally imposes no barrier to retrial. *See United States v. Borromeo*, 954 F.2d 245, 247 (4th Cir. 1992) (citing *United States v. Tateo*, 377 U.S. 463 (1964)) ("[T]he government is not barred from retrying cases when the first trial ends on the defendant's motion for mistrial."); *United States v. Alvarez*, 351 F.3d 126, 129-30 (4th Cir. 2003) (holding that where district court entered an order labeled "Judgment of Acquittal" that was based on matters unrelated to the sufficiency of the evidence against the accused, Double Jeopardy Clause did not bar re-trial); *cf. Oregon v. Kennedy*, 456 U.S. 667, 676 (1982) ("Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded and aborting the first on his own motion.").

In this case, Holbrook's first jury trial ended at her behest, without any "goading" by the Government, when she decided to enter a plea of guilty after the district court ruled that she could not put on a justi-

---

864. Because the parties in that case did not mean for the provision in question to have an *agreed upon* meaning that was different from that which was facially suggested, the district court erred in not reverting to the unambiguous text. *Id.* at 864-65. As explained above, the Agreement here unambiguously allowed the Government to retry Holbrook on Count Two without voiding the Agreement. Thus, our holding today does not implicate the holding in *Smith* at all.

fication defense. Holbrook has not suggested, either below or on appeal, that the evidence against her was anything less than sufficient to support a conviction. To the contrary, Holbrook stipulated in the Agreement that there was "a sufficient factual basis to support each and every material factual allegation contained within" the indictment. (J.A. at 315.) In short, the Government's re-trial of Holbrook on Count Two is "scarcely a picture of an all-powerful state relentlessly pursuing a defendant who had either been found not guilty or who had at least insisted on having the issue of guilt submitted to the first trier of fact." *United States v. Scott*, 437 U.S. 82, 96 (1978). Accordingly, because Holbrook herself terminated the first trial and has made no allegation that this termination was the result of any governmental misconduct, we reject Holbrook's double jeopardy challenge and affirm the district court's denial of Holbrook's motion to dismiss Count Two.

C.

In her third, and final, argument on appeal, Holbrook asserts that the district court, in calculating the sentence for her conviction on Count One, erred in finding that she acted with malice in killing Larry Holbrook. We review a district court's factual determinations made in connection with sentencing for clear error and its legal interpretation of the Sentencing Guidelines *de novo. United States v. Dawkins*, 202 F.3d 711, 714 (4th Cir. 2000).

Section 2K2.1 of the Guidelines governs Holbrook's conviction under Count One, and provides that, where the defendant used a firearm in connection with the commission of another offense in which death results, the sentencing court must apply "the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above." U.S.S.G. § 2K2.1(c)(1)(B). Because Holbrook's base offense level on Count One would have been 14 absent the cross-reference, and the possible base offense levels under the homicide guidelines were greater than 14, the district court correctly cross-referenced Holbrook's convictions to the homicide guidelines. The district court found that Holbrook acted with malice in killing Larry Holbrook and accordingly applied the second-degree murder guideline, U.S.S.G. § 2A1.2.

We see no error, clear or otherwise, in the district court's finding that Holbrook acted with malice. As the district court accurately explained at sentencing, the evidence showed quite convincingly Holbrook's malice in committing this crime: she had apparent motive; she doggedly sought to acquire a functioning weapon in the weeks prior to the shooting; she attempted to make the shooting look like a suicide by moving the victim's body and wiping the weapon clean of her fingerprints; and she repeatedly changed her story about what happened on the date of the shooting. Given this evidence, the district court was more than justified in finding that Holbrook acted with malice.

III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

KING, Circuit Judge, dissenting:

Because the decision of the panel majority disregards precedent and will undermine the fair administration of justice in this Circuit, I write separately to explain my profound disagreement. Paragraph D(a) of the Plea Agreement provides, in plain terms, that in the event of a breach by Holbrook, the United States Attorney's office may "declare this Agreement void and proceed to trial" (the "Trial Remedy"). Although the Trial Remedy is clear and unambiguous, the majority has avoided its application altogether. The majority opinion has thereby failed to apply controlling precedent, and its decision thus stems from an erroneous approach to the issue of whether the Government adhered to its obligations. More specifically, the majority (1) fails to observe the elementary principles applicable to the interpretation of plea agreements; (2) construes the Agreement in favor of the Government; and (3) rewrites the Agreement to justify the Government's actions.

Before turning to a detailed explanation of the deficiencies in the majority opinion, I take the opportunity to provide a brief overview

of the majority's problem. As aptly observed by John Adams during his defense of British soldiers charged with the Boston Massacre, "[f]acts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions," they cannot be altered. J. Bartlett, *Bartlett's Familiar Quotations* 462b (14th ed. 1968). And the relevant facts of this appeal — the terms of the Agreement written by the Government — entirely undermine the ruling of the majority. Without revising the terms of the Agreement, the theories of the majority do not withstand scrutiny. As has been true throughout history, it is simply impossible — regardless of the effort expended — to construct a "silk purse from a sow's ear."

As explained more fully below, I would reverse the district court and remand for further proceedings.

## I.

## A.

During the initial trial on her two-count Indictment on firearms charges, Holbrook and the Government entered into the Agreement of August 23, 2001.[1] Pursuant thereto, they agreed, inter alia, that Holbrook would plead guilty to Count One, that the Government would dismiss Count Two, and that the Government would recommend that Holbrook receive credit for acceptance of responsibility. With respect to a breach by Holbrook, the Agreement's Paragraph D (the "Remedies Clause") provides, in pertinent part:

> I [Holbrook] understand that if I breach any provision of this agreement, at any time, that the United States Attorney's office may, at its election, pursue any or all of the following remedies: (a) declare this plea agreement void and proceed to trial; (b) refuse to recommend . . . acceptance of responsibility; (c) seek an upward departure from the guidelines range, or seek imposition of a sentence at the high end

---

[1]The nature of the underlying offenses and their factual underpinnings, spelled out with some specificity in the majority opinion, *see ante* pp. 3-4, are irrelevant to whether the Government breached its obligations under the Agreement.

of the guidelines range; (d) terminate my opportunity to per-
form substantial assistance . . . ; (e) refuse to make a sub-
stantial assistance motion . . . ; (f) withdraw any substantial
assistance motion made . . . ; (g) refuse to abide by any other
sentencing or other stipulations contained in this plea agree-
ment; (h) take any other action provided for under this
agreement or by statute, regulation or court rule.

Agreement ¶ D. The Government's right to utilize the Remedies
Clause is triggered by a breach of the Agreement by Holbrook, as
explained in Paragraph H (the "Breach Clause"). More specifically, if
Holbrook breached the Agreement by seeking to withdraw her guilty
plea on Count One, the Government, pursuant to the Breach Clause,
could utilize the remedies set forth in the Remedies Clause. The
Breach Clause provides, in pertinent part:

I [Holbrook] hereby agree and stipulate that if I do any of
the following, I should not receive credit for acceptance of
responsibility and the United States will be free to make any
recommendations it wishes at sentencing *or to declare a
breach of this plea agreement and seek the remedies set
forth in paragraph D: (1) attempt to withdraw my guilty
plea* . . . .

Agreement ¶ H (emphasis added). Pursuant to the Remedies Clause,
if the Government, in response to a breach by Holbrook, desired to
proceed to trial, it could do so by invoking the Trial Remedy, i.e., by
"declar[ing] this plea agreement void and proceed[ing] to trial."

On November 5, 2001, Holbrook sought to withdraw her guilty
plea, in contravention of the Breach Clause. In so doing, she asserted
that she was not mentally competent when she entered her plea, that
she was then acting under duress, and that she possessed a valid
defense to the charges. On November 7, 2001, the United States
Attorney informed Holbrook that she was considered to be "in breach
of the plea agreement." And due to this breach, the Government
asserted that it would not move to dismiss Count Two and would
instead try her on that charge. Notwithstanding the Trial Remedy, the
Government asserted that it "tak[es] these actions under the plea

agreement and does not renounce the plea agreement or declare it void."

On November 8, 2001, and again six months later on May 9, 2002, the district court heard evidence on Holbrook's motion. The court then denied her motion and scheduled sentencing on Count One. The United States Attorney sought a continuance of her sentencing to permit him to "withdraw [the Government's] promise to dismiss" Count Two, to try her on that charge and, assuming her conviction, to have her sentenced in a single proceeding. Holbrook objected, asserting, inter alia, that the Trial Remedy did not authorize the Government to proceed to trial unless the United States Attorney first voided the Agreement.[2] And if the Agreement were declared void, Holbrook's guilty plea and conviction on Count One would thereby be vacated. The court disagreed with Holbrook's position and, on June 25, 2002, authorized the Government to proceed to trial on Count Two only, without vacating her conviction on Count One. *See United States v. Holbrook*, 207 F. Supp. 2d 472, 473 (W.D. Va. 2002).

The district court found that Holbrook's effort to withdraw her plea contravened the Breach Clause, and it concluded that the United States Attorney was required to seek a remedy under the Remedies Clause. *Id.* at 475. Recognizing that the Trial Remedy mandated the United States Attorney to void the Agreement in order to proceed to trial, the court premised its ruling on the Agreement's Paragraph D(g)

---

[2]Holbrook's objection to trial was based primarily on her contention that her *unsuccessful* attempt to withdraw the guilty plea did not constitute a material breach. The materiality issue is not raised in this appeal, however, and thus is not subject to review in this proceeding. *See United States v. Brower*, 336 F.3d 274, 277 n.2 (4th Cir. 2003) (explaining that issues not raised in parties' briefs are generally waived). I have reservations, however, on whether an unsuccessful effort to withdraw a plea could constitute a material breach. A material breach is one going to the root or essence of the agreement or "a failure to do something that is so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract . . . .'" 23 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 63:3 (4th ed. 1999). Notwithstanding Holbrook's unsuccessful attempt to withdraw her plea to Count One, the essential purpose of the Agreement remained intact.

(the "Catchall Remedy"). Pursuant thereto, the Government, in the event of a breach, is entitled to "refuse to abide by any other sentencing or other stipulations contained in this plea agreement . . . ." According to the court, Paragraph I of the Agreement (entitled "Dismissal of Charges"), by which the United States Attorney agreed to dismiss Count Two of the Indictment (the "Dismissal Clause"), constitutes a "stipulation" under the Catchall Remedy.[3] *Id.* The court reasoned that, because the United States Attorney was not obligated to comply with the Dismissal Clause, he could proceed to trial on Count Two alone. *Id.*

On July 26, 2002, after a three-day trial, Holbrook was convicted on Count Two. She was then sentenced to 120 months in prison on Count One and to a consecutive term of ninety months on Count Two. This appeal followed.

### B.

As both the panel majority and the Government recognize, we apply basic contract principles to the interpretation of a plea agreement. *United States v. McQueen*, 108 F.3d 64, 66 (4th Cir. 1997) (analyzing government's breach of oral plea agreement under contract law); *United States v. Ringling*, 988 F.2d 504, 506 (4th Cir. 1993) (analyzing plea agreement according to material breach principle of contract law). Certain of these elementary principles are applicable to this dispute. First, as the Government concedes, a contract must be construed according to the plain meaning of its terms. 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:3 (4th ed. 1999). Second, we must read each provision of a plea agreement as part of the whole, such that no word, phrase, or term is rendered superfluous. *Id.* § 32:5. Importantly, "[a]n interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable." *Id.*; *see United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998) (applying rule to plea agreements). And finally, when there is a con-

---

[3]The district court failed to recognize or address the fact that Paragraph J of the Agreement, entitled "Stipulations and Recommendations" (the "Stipulations Clause") is the only paragraph of the Agreement designated as containing "Stipulations." *See infra* note 7.

flict between general and specific provisions of a contract, the specific clause controls its meaning. 11 Williston & Lord § 32:10; *cf. Allen v. Thomas*, 161 F.3d 667, 672 (11th Cir. 1998) (finding general language insufficient to waive specific rights).

Because a defendant's underlying "contract" right is constitutionally based, however, our interpretation of a plea agreement is in many respects unique. As a result, and as Judge Phillips properly recognized several years ago, judicial review of a plea agreement must reflect "concerns that differ fundamentally from and run wider than those of commercial contract law." *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) (concluding that government's breach of plea agreement implicated due process concerns by impairing voluntary and intelligent nature of plea); *see also McQueen*, 108 F.3d at 66 (explaining that "defendant's fundamental and constitutional rights hang in the balance" with respect to plea agreements); *Ringling*, 988 F.2d at 506 (same); *United States v. Smith*, 976 F.2d 861 (4th Cir. 1992) (applying same principle to immunity agreements). And "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). It is vitally important that, in criminal proceedings, our concerns "run even wider than protection of the defendant's individual constitutional rights — to concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Harvey*, 791 F.2d at 300 (quoting *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972)). Accordingly, in plea agreement matters, the Government is obliged to conform its actions to a higher standard than we expect from a typical contracting party, and we are obliged to construe any ambiguities and inconsistencies in a plea agreement against the Government. *See, e.g.*, *McQueen*, 108 F.3d at 66 (suggesting that plea agreements should be in writing because, in the words of Judge Russell, "the government bears a greater responsibility than the defendant for inaccuracies and ambiguities in a plea agreement"). The Government's greater responsibility is magnified when, as here, it has written the Agreement. *Harvey*, 791 F.2d at 300.

## II.

The plea agreement process is an essential and carefully-structured component of our criminal justice system. Because the vast majority of defendants plead guilty, the "fairness and adequacy of the procedures on acceptance of pleas of guilty are of vital importance in according equal justice to all in federal courts." Fed. R. Crim. P. 11 advisory committee's note. Unfortunately, the majority's decision of today poses a distinct threat to this fundamental concept. In its opinion, the majority has (1) failed to adhere to the plain meaning apparent within the whole of the Agreement; (2) construed the Agreement against Holbrook; and (3) rewritten the Agreement.[4]

## A.

In order to uphold the Government's actions, the majority has found it necessary to disregard the principles of interpretation that we are obliged to apply in plea agreement disputes. First of all, we must construe a plea agreement according to the plain meaning of its terms. 11 Williston & Lord § 32:3 (explaining principle). And the *pertinent* provisions of this Agreement could not be more plain. Second, we must read the Agreement as a whole, such that no word, phrase, or term is rendered superfluous. *Id.* § 32:5 (explaining principle); *see Brye*, 146 F.3d at 1211 (applying principle to plea agreements). In order to justify its position, the majority ignores this principle altogether, disregarding the controlling provision of the Agreement, i.e., the Trial Remedy. As explained below, a proper application of these elementary principles mandates a reversal of the district court.

## 1.

We begin our analysis, as we must, with an examination of the Agreement's terms. The Breach Clause provides, inter alia, that if Holbrook "attempt[s] to withdraw [her] guilty plea," the Government

---

[4]The majority's construction of the Agreement, which ignores the Government's obligation to Holbrook under the Trial Remedy, recalls Shakespeare's cynical observation that "[o]ft expectation fails, and most oft there / where most it promises." William Shakespeare, *All's Well that Ends Well*, Act II, Sc. 1.

may (1) "declare a breach of the plea agreement," and then (2) "seek the remedies set forth in Paragraph D [the Remedies Clause]." Agreement ¶ H. Under the Remedies Clause, there is only *one* remedy — the Trial Remedy — authorizing the Government to proceed to trial. And under the Trial Remedy, the Government can proceed to trial only upon voiding the Agreement.

The majority has decided that it can ignore the Trial Remedy, and it instead relies on two alternative theories in concluding that the Government could proceed to trial without voiding the Agreement. First, the majority contends that the Government could proceed under the Catchall Remedy, which authorizes the United States Attorney, inter alia, to refuse to abide by any stipulations in the Agreement. *See ante* pp. 11-12. Under this theory, the Dismissal Clause constitutes a "stipulation" under the Catchall Remedy, and the Government was no longer required to dismiss Count Two. Alternatively, the majority relies on Paragraph D(h) of the Remedies Clause, which provides that the Government may "take any other action provided for under this agreement or by statute, regulations or court rule." *See ante* p. 13. According to the majority, the Government's obligation under the Dismissal Clause constitutes an "other action provided for under this agreement," and Holbrook's breach releases the Government from its obligation to dismiss Count Two.[5] Under either theory, however, the result reached by the majority is premised on the Dismissal Clause, which says exactly nothing about proceeding to trial. The majority's rationale thus rests on its implication that, when a criminal charge is pending, the Government must necessarily and always proceed to trial.[6]

---

[5]The majority's alternative theory that Paragraph D(h) supports the Government's actions is entirely new — neither the district court nor the Government raised it.

[6]The majority's suggestion that the Speedy Trial Act, 18 U.S.C. §§ 3161-74, somehow authorized the Government to act as it did is baseless. *See ante* p. 13 & note 5. The Act does not prohibit the Government from entering into an agreement restricting its right to proceed to trial, nor does it authorize the Government to breach its agreements. Instead, the Act simply requires that an indictment be dismissed, upon a defendant's motion, if the defendant is not brought to trial within the relevant time limit. *See* 18 U.S.C. § 3162(a)(2).

While a breach by Holbrook might support a decision by the United States Attorney not to dismiss Count Two, the Dismissal Clause neither addresses the issue of trial nor authorizes the Government to proceed to trial. Thus, the majority's implication that the Dismissal Clause authorizes a trial on Count Two is unwarranted, and it is inconsistent with the specific terms of the Trial Remedy. In any event, if the Government had wanted to reserve the right to proceed to trial under the Dismissal Clause, it would have negotiated for such a provision and written the necessary words "proceed to trial" in that Clause. It chose not to do so, and it is bound by that choice.

Put simply, the decision of the panel majority contravenes the principle that the plain meaning of the Agreement must control. The only provision of the Agreement authorizing the Government to proceed to trial is the Trial Remedy. And the Trial Remedy is written in the conjunctive ("declare this plea agreement void and proceed to trial"), requiring the United States Attorney to void the Agreement in order to proceed to trial. In these circumstances, the majority decision has contravened the plain meaning principle.

2.

By its opinion, the panel majority has also contravened the basic rule that a contract must be read as a whole, such that no clause is rendered meaningless or superfluous. *See* 11 Williston & Lord § 32:5 (explaining principle); *Brye*, 146 F.3d at 1211 (applying principle to plea agreements). In deciding that the Dismissal Clause authorizes the United States Attorney to proceed to trial, the majority has rendered the Trial Remedy meaningless and superfluous. Why would any prosecutor utilize the Trial Remedy and void the Agreement if he could "have his cake and eat it too," by proceeding to trial under the Dismissal Clause without giving up his conviction on Count One?[7] The answer is obvious — absent a lapse of competence, he would not.

---

[7]In addition to rendering the Trial Remedy superfluous, the majority's reasoning renders the heading of the Stipulations Clause superfluous. The Catchall Remedy, relied on by the majority, authorizes the United States Attorney, inter alia, to refuse to abide by any stipulations in the Agreement. The Stipulations Clause is found under the heading "J. *Stipu-*

And if the Agreement is construed as containing superfluous provisions, the Trial Remedy is not the provision to be rendered meaningless. In the event of a conflict between general and specific clauses of a contract, the specific clause controls and governs the contract's meaning. 11 Williston & Lord § 32:10 (explaining this principle); *see Allen*, 161 F.3d at 672 (applying this principle to plea agreements). The Trial Remedy specifically authorizes the United States Attorney to proceed to trial, whereas the Dismissal Clause simply refers to the Breach Clause, failing to discuss or describe any process for proceeding to trial. As such, the Trial Remedy, as the specific provision relating to a trial, governs the more general provisions of the Agreement, and the Government was obligated to proceed under the Trial Remedy. The failure and refusal of the United States Attorney to do so constitutes a breach of the Agreement by the Government.

### B.

As we made clear in *Harvey*, "both constitutional and supervisory concerns require holding the Government to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." *Harvey*, 91 F.2d at 300. This principle flows not only from the fact that the Government typically writes the plea agreement, but also from the fact that such agreements involve the "'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Id.* (quoting *Carter*, 454 F.2d at 428). While the controlling provision of the Agreement is clear — i.e., the Government can, pursuant to the Trial Remedy, proceed to trial only if it first voids the Agreement — we would be obliged to resolve any ambiguities or inconsistencies in Holbrook's favor. *See id.* The panel

---

*lations* and Recommendations." And under applicable principles of law, the headings of a contract must be given their meaning, unless the contract specifically manifests a contrary intent. 11 Williston & Lord § 32:5. This Agreement does not manifest a contrary intent, and the Stipulations Clause thus contains the Agreement's stipulations. The majority's characterization of the Dismissal Clause as a stipulation, when the Agreement otherwise contains a clause entitled "Stipulations and Recommendations," is simply wrong.

majority, however, fails to do so. Indeed, disregarding this principle and our precedent, it does just the opposite.

Of importance, the relevant language of the Agreement is clear: only *one* aspect thereof — the Trial Remedy — authorizes the Government to proceed to trial. Under its terms, the Government can, in the event of a breach, proceed to trial only if it first voids the Agreement (thereby vacating Holbrook's guilty plea and conviction on Count One, and permitting a trial on both charges). In ruling otherwise, the majority finds in the Dismissal Clause an implied authorization for the United States Attorney to proceed to trial without voiding the Agreement. This conclusion relies on the flawed logic that the right not to dismiss Count Two necessarily implies the right to proceed to trial thereon. Even if the Dismissal Clause is ambiguous, such an ambiguity must be construed against the Government, as the drafter thereof. The majority's failure to adhere to this principle compounds its erroneous ruling.

## C.

Finally, my colleagues of the panel majority have improperly rewritten the Agreement for the benefit of the Government. At oral argument, the Government conceded that the Agreement would have been "clearer" if the prosecutor had simply added the words "proceed to trial" to the Dismissal Clause. In hindsight, according to the prosecutor, he wished he had done so. The majority, contrary to precedent, does the Government's work by adding this phrase, and other more expansive language, to the Agreement. In *Smith*, this Court addressed an agreement, executed by the Government, containing the following clause: "'[T]he United States will not prosecute of [sic] Mr. Smith for any federal offense based on information now in the possession of the government.'" *Smith*, 976 F.2d at 862. In order to save the Government from its poorly-drafted agreement, the district court effectively rewrote that clause by adding the following language: "'insofar as it would have indicated the commission of a crime on the part of the defendant.'" *Id.* at 863. We reversed, explaining that the judiciary cannot rewrite an agreement simply because the Government made a mistake, or because it regrets what it has written and agreed to. *See id.* at 863-65. Indeed, neither we nor any other court has ever counte-

nanced a judicial rewriting of an agreement for the Government's benefit.

The Dismissal Clause, in order to be utilized in support of the majority's ruling, has effectively been rewritten to add specific terms, which supercede and render for naught the Trial Remedy. As applied by the panel majority, the Dismissal Clause, which provides only that "[u]pon meeting the conditions set forth in paragraph H [the Breach Clause] of this agreement, the United States will move to dismiss Count Two of the Indictment," now reads as follows (with language necessarily implied by the majority reflected in italics):

> Upon meeting the conditions set forth in paragraph H [the Breach Clause] of this agreement, the United States will move to dismiss Count Two of the Indictment. *In the event of a breach by Holbrook, however, and notwithstanding the contrary provisions of Paragraph D(a) [the Trial Remedy], the United States Attorney may, in his discretion, proceed to trial on Count Two without declaring this plea agreement void. And the parties further agree that the provisions of this Paragraph I [the Dismissal Clause] shall supercede and render for naught the contrary provisions of Paragraph D(a) [the Trial Remedy].*

In rewriting the Dismissal Clause, the majority has authorized the Government to crawfish on the terms of the Agreement it prepared and executed. Our controlling precedent, as explained by Judge Murnaghan in *Smith*, simply does not authorize such an activity.

In order for our criminal justice system to function fairly and efficiently, the Government must abide by its commitments, its word must always be its solemn bond, and any deviations therefrom cannot be countenanced. Judge Wilkinson's explanation of this fundamental principle cannot be improved upon: "[b]ecause a government that lives up to its commitments is the essence of liberty under law, the harm generated by allowing the government to forego its plea bargain obligations is one which cannot be tolerated." *United States v. Peglera*, 33 F.3d 412, 414 (4th Cir. 1994). The panel majority has ignored this settled principle, in disregard of the terms of the Agreement and controlling precedent.

Pursuant to the foregoing, I must respectfully dissent from the decision of the panel majority.[8]

---

[8]Because I would remand and direct the Government to adhere to the Agreement, the other two issues raised in this appeal — relating to double jeopardy and sentencing — would be rendered moot.